301 Ga. 83
FINAL COPY

S17A0254.  WILSON v. THE STATE.

HINES, Chief Justice.

Following the partial denial of his motion for new trial, as amended, Nicholas Wilson appeals his convictions and sentences for malice murder and other crimes in connection with the November 2009 robbery of Cassandra James and her fatal stabbing in December 2009.  His sole challenge is that the trial court erroneously excluded an out-of-court declaration regarding certain evidence in the case.  For the reasons that follow, we affirm.[1]

---

[1] The robbery and its related crimes occurred on November 20, 2009; the murder and its related crimes occurred between December 14 and 16, 2009.  On June 22, 2012, a Fulton County grand jury returned a 15-count indictment against Wilson: Count 1 — malice murder; Count 2 — felony murder while in the commission of armed robbery; Count 3 — felony murder while in the commission of aggravated assault; Count 4 — felony murder while in the commission of burglary; Court 5 — armed robbery; Count 6 — aggravated assault (stabbing); Count 7 — burglary; Count 8 — robbery by force; Count 9 — aggravated assault (choking with hands); Count 10 — false imprisonment; Count 11 — terroristic threats; Count 12 — financial transaction card theft; Count 13 — financial transaction card fraud; Count 14 — financial transaction card fraud; and Count 15 — financial transaction card fraud. Wilson was tried before a jury June 24-27, 2014, and found guilty of all charges.  On June 27, 2014, Wilson was sentenced to life in prison on Count 1; 20 years in prison on Count 8, to be served consecutively to the sentence on Count 1; 20 years in prison on Count 9, to be served concurrently with the sentence on Count 8; ten years in prison on Count 10, to be served concurrently with the sentence on Count 9; five years in prison on Count 11, to be served concurrently with the sentence on Count 10; three years in prison on Count 12, to be served concurrently with the sentence on Count 11; three years in prison on Count 13, to be served concurrently with the sentence on Count 12; three years in prison on Count 14, to be served concurrently with the sentence on Count 13; and three years in prison on Count 15, to be served concurrently with the sentence on Count 14.  The trial court found that Counts 2 through 7 merged with Count 1 for the purpose of sentencing.  A motion for new trial was filed on

Construed to support the verdicts, the evidence showed the following. Wilson was incarcerated on August 21, 2009 and released from jail on November 19, 2009. While in jail, he shared a room with Ernesto Powell, Cassandra James's then-boyfriend. The men discovered that they both knew James as Wilson had at one time dated her. During the time that Wilson and Powell were cell mates, Powell and James talked daily and wrote letters to each other; James received monthly disability checks, and she weekly transferred money into Powell's jail account. Wilson was eventually moved into a different room and Powell did not see him again.

Around noon on November 20, 2009, as Powell was having a telephone conversation with James, Wilson arrived at James's apartment located in Fulton County. Powell asked to speak with Wilson, and Wilson told him that

July 11, 2014, and the motion was amended on February 22, 2016. On June 1, 2016, the motion, as amended, was granted in part and denied in part; the court set aside the conviction and sentence on Count 14 due to insufficient evidence, but denied the motion as to all other claims. In such order, the trial court also noted that it had incorrectly found that the felony murders in Counts 2 through 4 "merged" with Count 1 rather than be vacated by operation of law, and that it would issue an amended sentence. That same day, the trial court entered an amended judgment sentencing Wilson to life in prison on Count 1, a concurrent ten years in prison on Count 5, a concurrent ten years in prison on Count 7, a consecutive 20 years in prison on Count 8, a concurrent 20 years in prison on Count 9, a concurrent ten years in prison on Count 10, a concurrent five years in prison on Count 11, a concurrent three years in prison on Count 12, a concurrent three years in prison on Count 13, and a concurrent three years in prison on Count 15; the verdicts on Counts 2, 3, 4, and 14 were found to be vacated by operation of law, and the verdict on Count 6 was found to merge with Count 1 for the purpose of sentencing. A notice of appeal was filed on June 30, 2016, and the case was docketed in this Court for the term beginning in December 2016. The appeal was submitted for decision on the briefs.

he had been released early from jail and that he was going to go with James to transfer money into Powell's jail account. Powell never received the money.

Later that day, Atlanta police got a call to come to James's apartment in connection with "someone being bound in a home" and unable to escape. The responding officers found the apartment doors locked, but managed to enter the apartment through a window. Inside, the police found James on the bedroom floor with her wrists partially bound and her ankles duct-taped together; a phone, which had been under the bed, was on the floor next to her. She told the police that her ex-boyfriend Wilson had robbed her and taken her credit card, EBT card, identification card, money, and keys to her apartment. In addition, Wilson forced her to disclose her PIN number. James further told the officers that she was "very fearful" of Wilson returning to her apartment because he had threatened to kill her if she called the police. While the officers were on the scene, James called the bank about her stolen credit card; she learned of multiple unauthorized transactions made that day, including two sales at retail stores and an ATM withdrawal. The bank determined that James was the victim of $1,160.04 in fraudulent transactions and credited her with that amount.

Following the robbery, James told her close friend, Janice Kemp, that Wilson had come to her apartment, choked her until she passed out, and duct-taped and robbed her; during the incident, Wilson told her that Powell had "a big mouth," talked too much, and related "all of [James's] business," including that she received disability checks. James changed the locks on her apartment and obtained a new cell phone.

During a telephone conversation on December 14, 2009, a crying and angry James told Kemp that Wilson's girlfriend had come to her apartment and told her that Powell had impregnated another woman. Concerned about James, Kemp called her phone the next morning, but no one answered. Kemp persisted and eventually a man answered James's phone; loud music was playing in the background. Kemp repeatedly asked the man to speak with James but he hung up the phone and did not answer Kemp's subsequent repeated calls.

The following day, December 16, 2009, Kemp went to James's apartment to check on her; she was accompanied by the apartment maintenance man. They knocked on the doors and called out to James but got no response. The front door was unlocked, but the maintenance man could not push it open; the man then unlocked the patio door, and Kemp entered. Kemp found James

dead, blindfolded and slumped in her water-filled bathtub. The crying Kemp left the apartment, and the maintenance man called the police.

James had been blindfolded with two bandanas, which were wrapped around her eyes, nose, and mouth. She was stabbed seven times in her neck, puncturing her jugular vein and carotid artery. She also sustained a cut on her right forefinger extending from the knuckle to the web of the hand, which wound was characteristic of people trying to defend themselves while being stabbed.

The detectives called to the crime scene discovered that the front door to the apartment had been barricaded with a sofa, table, and two kitchen chairs. No weapons consistent with James's wounds were found in the apartment. There were drops of blood on and around the bathroom sink, which tested positive for James's DNA. The front door to James's apartment appeared to have been kicked in; the door framework was splintered and fractured, the deadbolt was rendered useless, and there was a noticeable footprint on the outside of the door. Detectives were also unable to locate James's cell phone or keys inside the apartment, leading them to suspect a robbery.

Detectives were informed by United States marshals with the Fugitive

Task Force that they were searching for Wilson in relation to the November crimes against James, and that they had tracked him to a nearby apartment leased by Wilson's then-girlfriend, Monica Russell. When marshals attempted to take Wilson into custody, he tried to jump from the balcony of Russell's apartment. During a subsequent search of Russell's apartment, pursuant to a search warrant, investigators found James's apartment keys and cell phone; call logs revealed calls between James's and Russell's cell phones December 14, 2009 through December 16, 2009. Photographs of Wilson's shoes were taken, and the sole print was found to match the pattern of the print found on James's damaged front door.

The police investigation also revealed a 2006 incident in which Wilson choked a female acquaintance until she lost consciousness and then left with her vehicle; the abandoned vehicle was later recovered. Subsequently, as the woman and her daughter were leaving their home, the woman heard someone scream, "Bitch, you called the police." She turned around and saw Wilson, who then began to shoot at them; they ran and called police. Wilson was ultimately convicted in connection with the case.

1. Wilson does not contest the legal sufficiency of the evidence of his

guilt. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record, and we conclude that the evidence at trial was sufficient to enable a rational trier of fact to find Wilson guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Wilson contends that the trial court erred in excluding evidence that the footprint on James's door was days old at the time of her death. But, the contention is unavailing.

In opening statement at trial, defense counsel told the jury that it would hear from James's property manager that a few days prior to James's death, she had gone to the rental office to report that someone had kicked in her door and to give her 30 days notice. After opening statements, the State raised a hearsay objection to the anticipated evidence, arguing that its admissibility would have to be considered under the residual exception to hearsay. See OCGA § 24-8-807.[2] The trial court deferred ruling on admissibility until further discussion of

---

[2] OCGA § 24-8-807 provides:

A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
(1) The statement is offered as evidence of a material fact;
(2) The statement is more probative on the point for which it is

the matter and until the property manager could be contacted. Later during trial, the State informed the trial court that the property manager had been contacted, and the State maintained that the alleged statement by James would not be admissible under the residual exception to hearsay in that it would fail to meet the requirement of trustworthiness or reliability as James and the property manager hardly knew each other and the property manager denied that James ever reported that her apartment door had been kicked in.

The trial court said that based upon the circumstances then before it the defense should assume that the State's objection to the alleged statement would be sustained, but that the court had an open mind on the issue and would consider any additional evidence as to trustworthiness supplied by the defense and have further discussion of the matter. Defense counsel responded that "obviously" they "wouldn't be calling" the property manager if they "hash it

offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
However, a statement may not be admitted under this Code section unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

8

out and it doesn't go our way" inasmuch as there was "no other purpose to call her." No defense tender was made.

The record makes plain that the trial court did not make a "definitive ruling" on the admissibility of the property manager's alleged statement as contemplated in OCGA § 24-1-103 (a).[3] Rather, it stated that the ultimate determination of its admissibility under OCGA § 24-8-807 was conditional upon any subsequent showing by Wilson and further discussion. Consequently, this Court's review of the issue is limited to one of "plain error[ ] affecting substantial rights." OCGA § 24-1-103 (d).[4]

---

[3] OCGA § 24-1-103 (a) provides:

> (a) Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and:
> (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
> (2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked.
> Once the court makes a *definitive ruling* on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal.

(Emphasis supplied.)

[4] OCGA § 24-1-103 (d) provides:
Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.

9

In regard to a plain-error review of a ruling on evidence, the analysis consists of four parts.

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Thus, beyond showing a clear or obvious error, plain-error analysis requires the appellant to make an affirmative showing that the error probably did affect the outcome below.

(Citations and punctuation omitted.)*Gates v. State*, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016).

Wilson urges that the circumstances before the trial court did support a finding of the anticipated statement's trustworthiness, and therefore, a ruling in favor of its admissibility under OCGA § 24-8-807, and that exclusion of such evidence resulted in "palpable" harm in that the defense attorney was portrayed by the State as a liar for failing to produce the evidence,[5] and that the

---

[5] There is no claim of prosecutorial misconduct in the State's closing comments about the failure to produce evidence of the claim that James's door was damaged prior to the time of her death.

evidence was necessary to show that James's door was already broken by December 14, 2009.

As to the admissibility of evidence under the residual exception to hearsay contained in OCGA § 24-8-807, it was designed "to be used very rarely, and only in exceptional circumstances[,] . . . when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *Smart v. State*, 299 Ga. 414, 421 (3) (788 SE2d 442) (2016), quoting *Rivers v. United States*, 777 F3d 1306, 1312 (II) (11th Cir. 2015).

> Such guarantees must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history. [Cit.] These categories of hearsay have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify. [Cit.] And they are all considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made.

(Punctuation omitted.) Id. at 422 (3).

However, pretermitting the question of whether the claimed statement by James to the property manager could have been properly admitted pursuant to

11

OCGA § 24-8-807, Wilson cannot make an affirmative showing that exclusion of the evidence probably affected the outcome of his trial. *Gates v. State*, supra at 328 (3). There was overwhelming evidence of Wilson's guilt including but not limited to evidence of his connection to James; his knowledge of her regular receipt of money; the timing of the crimes in relation to Wilson's release from jail; his violent robbery of James and his threat to kill her if she called police, which echoed his prior violent robbery of another woman and his attempt to kill her for reporting the crime to police; the use of James's cell phone following the murder; the recovery of James's cell phone and keys in Wilson's girlfriend's nearby apartment; and the fact that the sole print found on James's kicked-in door, regardless of when it was made, matched Wilson's. Simply, it cannot be said that any error in the exclusion of the claimed evidence likely affected the outcome of Wilson's trial.[6] Id.

Judgments affirmed. All the Justices concur.

Decided May 1, 2017.

---

[6] The defense's theory of James's death was that it was a suicide, i.e., that she took overdoses of prescription medications, drew a bath (and apparently blindfolded herself), and then stabbed herself in the neck seven times.

12

Murder. Fulton Superior Court. Before Judge McBurney.

Andrew S. Fleischman, for appellant.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Lyndsey H. Rudder, Arthur C. Walton, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.