312 Ga. 503
FINAL COPY

S21A0845. ANGLIN v. THE STATE.

PETERSON, Justice.

Daniel Anglin appeals his convictions for malice murder and other crimes in connection with the shooting death of Chad Ruark.[1] Anglin argues that the trial evidence was insufficient to support his convictions; the trial court erred in handling an untimely disclosure that someone else purportedly confessed to killing Ruark; trial counsel was ineffective for failing to object to a lay witness's scientific conclusions; and the cumulative effect of these errors

---

[1] Ruark went missing sometime around February 24, 2016, and his body was found on March 8, 2016. In February 2017, an Oconee County grand jury indicted Anglin for malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a crime. On November 3, 2017, a jury found Anglin guilty on all counts. The trial court sentenced Anglin to life in prison without the possibility of parole for malice murder and a five-year consecutive term for the firearm offense; the remaining counts were vacated by operation of law or merged for sentencing purposes. Anglin filed a timely motion for new trial, which he later amended. Following a hearing, the trial court denied the motion. Anglin timely appealed; his case was docketed to this Court's April 2021 term and argued before this Court on August 25, 2021.

prejudiced him. We affirm because the evidence was sufficient to authorize a jury to conclude that Anglin was guilty; Anglin has not shown that the untimely disclosure prejudiced him; trial counsel was not ineffective for failing to object to the witness's testimony because it was not based on scientific training or other specialized knowledge; and there are no errors to consider cumulatively.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed the following. Daniel Anglin and Chad Ruark worked together in construction, and Anglin was married to Ruark's sister Elizabeth. Anglin abused and sold prescription pain pills. Anglin was concerned that his wife would kick him out of the house if she ever found out about his illegal drug activity. On February 21, 2016, Anglin and Ruark exchanged text messages about money, and Anglin told Ruark that his wife overheard him talking so "she knows" and he was now "screwed all the way around." Ruark responded that Anglin had hurt his sister, he was "still waiting on that thousand," and Anglin left Ruark no choice but to tell her about Anglin's drug activity.

On February 26, Ruark failed to show up to collect his pay for a construction project he had completed a few days earlier with his brother, Joseph Ruark. Because Ruark failed to show up and had not responded to Joseph's recent calls and text messages, Joseph reported Ruark as missing to the Oconee County Sheriff's Office. Joseph and a deputy went to Ruark's home that night. There were no signs of forced entry or anything unusual other than the presence of Ruark's dress boots, which he usually wore whenever he left the house. The deputy spoke to Anglin around this time, who told him that Ruark said he was going to Florida to do a construction job. Anglin said the same thing to Joseph, adding that Ruark left because he "didn't feel right" at home and wanted to work in Florida.

On February 28, a private investigator organized a search party, which included Anglin, to look for Ruark near his house. Just before the search began, Joseph and Ruark's ex-wife, Amanda Ashley, received a text message from an unknown number, claiming to be Ruark. The text said that Ruark had found a new place to live where he did not feel like an "outcast" and that he would "be in touch

3

in a few weeks." Just as he had told Joseph, Anglin told Ashley that Ruark said he was going to Florida to do construction work. Ashley told Anglin that his story was "bulls**t," and neither she nor Joseph believed that Ruark sent the text. According to Joseph and Ashley, Ruark loved his two young children and would not have left without an explanation. Ashley also explained that the wording of the text was not how Ruark spoke or texted, and that she had never heard him use the word "outcast" or complain about his relationship with his family.

During the search, volunteers were paired up and given a specific area to cover. Anglin and his partner were directed to focus on an area behind the house, but instead of doing so, Anglin searched an area along the fence line, acted "weird" and "nervous," and told his search partner to look somewhere else. One of the volunteers found a letter that Ruark purportedly had written to his children, but the investigator believed it was a "fresh writing."

The sheriff's office later learned that the suspicious text message was sent from a cell phone purchased at a Family Dollar

store. A cashier from the store identified Anglin as the person who had purchased the cell phone. Anglin agreed to talk to the sheriff's office and, during an interview, admitted buying the phone and sending the text message. When asked where Ruark was, Anglin said he did not know. Upon leaving the sheriff's office, Anglin saw his wife, Elizabeth, who was waiting to be interviewed. She asked, "What have you gotten me into?" Anglin replied, "Nothing, as long as you say I was at the Walmart."

After Elizabeth was informed that Anglin admitted sending the text message, she confronted him about it. He would not answer any of her questions and merely replied, "The only thing I can say is I'm sorry." The next day, Anglin left home, saying he was going to clear his name and find Ruark. On March 6, Anglin asked his brother to take him to a remote area where he intended to stay for a few days. Anglin told his brother that he had bought a handgun for Ruark. Evidence showed that Anglin bought an RG 23-model .22-caliber handgun on February 24, a few days before Ruark went missing, and bank records showed unusual activity in Anglin's bank

account around this time.

On March 8, the sheriff's office conducted a canine search of Ruark's property. During the search, a neighbor stopped by to report seeing a black truck at the property early in the week Ruark went missing. Anglin drove a black Chevrolet S-10 truck at the time. Searching the property, the canine unit found a hidden grave with Ruark's body inside. The grave was in the area Anglin had "searched" on his own and steered his search partner away from during the February 28 search. Ruark's cause of death was determined to be .22-caliber gunshot wounds to the back of the head and neck.

After discovering Ruark's body, deputies again interviewed Anglin. After being told that Ruark's body was found and that he had been shot with a .22-caliber gun, Anglin said there was no way he could have killed Ruark, stating repeatedly that he did not know what happened. Anglin acknowledged that the evidence of guilt was pointing toward him, but said that if he killed Ruark, he did not know how he did it. Anglin said that he had a dream in which Ruark

6

was walking in front of him and then fell to the ground.

Anglin was arrested following the interview. Deputies searched his home and found several .22-caliber bullets and a flat shovel hidden under a small addition to the house. Deputies also collected samples of dried mud found on the shovel and compared them to soil samples taken from Anglin's property and from the gravesite. Soil samples recovered from the shovel were inconsistent with the soil from Anglin's property, but matched the soil samples taken from the gravesite.

1. Anglin argues that the evidence was insufficient to support his convictions because it was circumstantial and the inferences the State sought to draw from the evidence were tenuous. He points out that no one testified about seeing him and Ruark ever argue and contends that the State's theory that he killed Ruark to keep Ruark from telling Elizabeth that Anglin abused and sold drugs was unbelievable because she testified at trial that she already knew that Anglin was selling pills.

When we consider a challenge to the sufficiency of the evidence, we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, was sufficient to authorize the jury to find the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *State v. Holmes*, 304 Ga. 524, 527 (1) (820 SE2d 26) (2018). We do not reweigh the evidence but defer to the jury's assessment of the weight and credibility of the evidence, leaving it to the jury to resolve conflicts or inconsistencies in the evidence. See *Williamson v. State*, 305 Ga. 889, 891 (1) (827 SE2d 857) (2019). "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (citation and punctuation omitted).

"The fact that the evidence of guilt was circumstantial does not render it insufficient." *Brown v. State*, 304 Ga. 435, 437 (1) (819 SE2d 14) (2018). But, as a matter of Georgia statutory law, "[t]o

warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Not every hypothesis is reasonable, however," and it is for the jury to determine whether an alternative hypothesis passes muster. *Brown*, 304 Ga. at 437 (1); *Johnson v. State*, 307 Ga. 44, 48 (2) (834 SE2d 83) (2019). Where the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis except that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law. See *Brown*, 304 Ga. at 437 (1).

The evidence here satisfied this standard. Days before Ruark was reported missing, he exchanged text messages with Anglin about money. When Anglin said he was "screwed all the way around" if his wife found out about his drug activities, Ruark replied that Anglin left him no choice but to tell her. Around the time Ruark went missing, a witness saw a black truck near Ruark's home. Anglin drove a black Chevrolet S-10 pickup truck. Shortly before Ruark's

9

disappearance, Anglin bought a .22-caliber revolver that could have fired the two bullets recovered from Ruark's body.

Anglin claimed he bought the gun for Ruark's supposed trip to Florida, and also that Ruark was moving to Florida because he felt like an outcast, a claim that Ruark's brother and ex-wife did not find credible. Anglin admitted that he sent a text message to them on the day of a search for Ruark, claiming to be the missing man. During that search, Anglin acted nervous when appearing to look through the area where Ruark's body was later found. Soil samples recovered from the shovel found at Anglin's house were inconsistent with the soil at his own property, but were indistinguishable from the soil samples taken near the gravesite. The above evidence was sufficient under *Jackson* and sufficient to authorize the jury to conclude that this evidence excluded every reasonable hypothesis except that of Anglin's guilt and, therefore, to find him guilty of the crimes for which he was convicted under OCGA § 24-14-6.

2. Anglin argues that the trial court erred in its handling of an untimely disclosure of purported *Brady* material. See *Brady v.*

10

*Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963). Although some of the facts surrounding the belated disclosure are troubling, Anglin's failure to show prejudice from the trial court's rulings is fatal to his claim.

On the morning of opening statements, Anglin's trial counsel announced that the prior evening, the prosecutor had told him that then-Oconee County Sheriff Scott Berry had received information that someone else had confessed to killing Ruark. Trial counsel said that, given the late hour he received this information and his focus on preparing for trial, he did not have a chance to contact the sheriff. Trial counsel asked for a one-day continuance to do so.[2] The trial court denied this motion, saying that trial counsel would still have opportunities to follow up with Sheriff Berry.

Three days later, on the final day of the trial, Anglin called

---

[2] Defense counsel stated:

Judge, in light of the information that I was provided yesterday evening, I'm still not exactly clear as to what happened between Sheriff Berry and the individuals that were telling him things. I have not been able to talk to Sheriff Berry. . . . But word of someone else admitting to this crime seems like it would be pretty relevant to the issue at hand. And I would like to know a little bit more about it before opening statements so that I can give the jury what I expect the evidence to be.

Sheriff Berry to testify. Trial counsel said that the two had not yet had a chance to talk, although he had given Sheriff Berry his phone number, but he was going to call Sheriff Berry to testify anyway. Because the State objected to possible hearsay, Sheriff Berry was first questioned outside the presence of the jury. He said that about two months before the trial, he received a phone call from a woman, Christy Houseman, who said that her ex-boyfriend, Daniel Hale, believed that the sheriff's office had "the wrong man in custody." Daniel Hale is the brother of James Hale, a sheriff's office investigator captain who investigated this case. At the time, Anglin was the only person jailed for the murder. The trial court ruled that Houseman's statements to Sheriff Berry were inadmissible hearsay, but allowed Anglin to ask Sheriff Berry in front of the jury whether he gave any information to Investigator Hale about any admissions.

When the jury returned, Anglin asked Sheriff Berry about whether there were any admissions in the case. Sheriff Berry described a conversation "related about hearing that somebody had heard that there had been an admission." But the trial court

12

prohibited Anglin from inquiring further into the substance of any conversations. Sheriff Berry also testified that the person he spoke to was Houseman and admitted that he did not document either his conversation with her or his follow-up discussion with Investigator Hale.

Anglin also called Investigator Hale, who was likewise first questioned outside the presence of the jury. Investigator Hale said that Sheriff Berry had told him that Houseman had called Daniel's ex-wife Kim Thomas to let her know that Daniel had admitted to killing Ruark, and then Thomas called the sheriff. Whereas Sheriff Berry said the conversation with Investigator Hale happened about two months prior to trial, Investigator Hale said that it was only about three weeks before trial. Investigator Hale said that he did not disclose this information to the district attorney's office until the first day of trial, explaining that although "there wasn't a lot for me going on" around the time he talked to Sheriff Berry, the weeks after he "got busy," including his assisting with seven death investigations.

Investigator Hale then testified before the jury that Sheriff Berry gave him some information about Daniel, that Houseman and Thomas were mentioned in their conversation, and that he had not attempted to contact Thomas and did not have the opportunity to interview Houseman. Investigator Hale admitted that Daniel and Ruark had once been close friends, but said they went their separate ways because Daniel was a "bad influence." Investigator Hale talked to his brother briefly at the time Ruark went missing, but neither he nor anyone else with the sheriff's office formally interviewed Daniel, attempted to search his house, or tried to obtain his phone records. Although Investigator Hale alluded to his brother being the subject of a conversation with Sheriff Berry, he made no reference to Daniel's purported admission that he killed Ruark. In closing arguments, trial counsel noted that some information came out that Daniel had admitted killing Ruark, observed that the sheriff's office did not document this information or investigate the claim in any way, and questioned the motives of Investigator Hale in not disclosing the information about his brother sooner.

14

At the hearing on his motion for new trial, Anglin submitted additional evidence in support of his *Brady* argument. A defense investigator testified that Houseman reported that Daniel admitted killing Ruark because the "devil made him do it." The defense investigator testified that Houseman believed Daniel was under the influence of drugs or alcohol when he made the statement, and that he later said he was joking. Appellate counsel for Anglin also proffered that she spoke to Thomas, who said she received information from Houseman and spoke to Sheriff Berry about it, but that he told her not to get involved.

In responding to the State's argument that this evidence still presented multiple hearsay problems, appellate counsel argued that he did not need to present Houseman's and Thomas's actual testimony because he was not trying to show that Daniel had committed the crime. Instead, appellate counsel said he was trying to show that the sheriff's office conducted a "shoddy investigation" by failing to document or follow up on information that someone else "allegedly confessed." Trial counsel testified at the motion for new

trial hearing that, had Daniel Hale's purported admissions been timely disclosed, he would have been able to investigate them adequately and use them in Anglin's defense to attack the thoroughness of the investigation. The State called Daniel to testify, and he denied killing Ruark or ever telling anyone that he had.

On appeal, Anglin argues that the trial court erred in failing to grant his request for a continuance so that he could investigate the untimely disclosure, that the untimely disclosure violated *Brady*, and that the trial court erred in prohibiting him from asking Sheriff Berry and Investigator Hale about Daniel's statements.

(a)    *The trial court's denial of a continuance.*

Anglin argues that the trial court erred in denying his request for a one-day continuance so that he could investigate the belatedly disclosed evidence before opening statements.

A trial court has broad discretion in granting or denying a motion for continuance. See OCGA § 17-8-22. We will not disturb a trial court's decision without a clear showing that it abused this discretion. See *Phoenix v. State*, 304 Ga. 785, 788 (2) (822 SE2d 195)

(2018). A defendant must show that he was harmed by the denial of a request for a continuance in order to be entitled to a new trial. See id.

Anglin has failed to show harm. He asked only for a one-day continuance to interview Sheriff Berry. Three days after being denied that request, he still had not done so, stating that he planned to call him to testify anyway. As discussed below, Anglin elicited evidence from Sheriff Berry that he used in his defense, and because Anglin never showed that he could present admissible evidence to support his defense, Anglin fails to show how the lack of additional time harmed him. As a result, this claim fails.

(b)   *Brady claim.*

To prevail on a *Brady* claim, a defendant must show that

> (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

*Schofield v. Palmer*, 279 Ga. 848, 852 (2) (621 SE2d 726) (2005). To

establish the fourth prong, often referred to as materiality, a defendant does not need to show that he necessarily would have been acquitted, but only that the State's "evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (115 SCt 1555, 131 LE2d 490) (1995) (citation and punctuation omitted). "[I]nadmissible evidence may be material under *Brady* if it could have led to the discovery of material admissible evidence." *Jones v. Medlin*, 302 Ga. 555, 560 (2) (807 SE2d 849) (2017) (citation and punctuation omitted).

In the case of an untimely disclosure, a defendant must show that an "earlier disclosure would have benefited the defense and that the delayed disclosure deprived him of a fair trial." *Dennard v. State*, 263 Ga. 453, 454 (4) (435 SE2d 26) (1993), overruled on other grounds by *Sanders v. State*, 281 Ga. 36, 37 (1) (635 SE2d 772) (2006).

> Whether a disclosure at trial is timely enough to satisfy *Brady* depends on the extent to which the delay in disclosing the exculpatory evidence deprived the defense of a meaningful opportunity to cross-examine the pertinent witness at trial, whether earlier disclosure

18

would have benefited the defense, and whether the delay deprived the accused of a fair trial or materially prejudiced his defense.

*In the Matter of Lee*, 301 Ga. 74, 78 (799 SE2d 766) (2017).

Anglin has not demonstrated how earlier disclosure would have benefited him. He concedes that the evidence contained multiple layers of hearsay — a statement from Daniel that was passed through one or two people before reaching Sheriff Berry, and then to Investigator Hale and to the district attorney before being communicated to his trial counsel. Such hearsay evidence can be material under *Brady* as long as Anglin can show that it would have led to the discovery of admissible evidence. But he has failed to do so.

Anglin argues that, had he been given the information sooner, he would have been able to "interview the pertinent witnesses . . . and secure their presence at trial," but he did not even secure Houseman's or Thomas's presence at the motion for new trial hearing. Even if either of them could have attended his trial, Anglin has not demonstrated that their testimony regarding Daniel's

confession would have been admissible. Anglin argues that their testimony could have been admitted as a statement against Daniel's interest, but for such statement to be admissible, Daniel would have had to be unavailable at trial. See OCGA § 24-8-804 (b) (3) (a statement against interest "shall not be excluded by the hearsay rule if the declarant is unavailable as a witness"). Given that Daniel testified at the motion for new trial hearing, and Anglin points to nothing else regarding his unavailability at trial, he has not met this threshold requirement.

Anglin also argues that the hearsay statements could have been admissible under the residual hearsay exception in OCGA § 24-8-807 ("Rule 807"), because Daniel's confession was a statement against interest that had a sufficient guarantee of trustworthiness. See *Wilson v. State*, 301 Ga. 83, 89 (2) (799 SE2d 757) (2017) (statements against interest generally have a sufficient guarantee of trustworthiness to be admissible under Rule 807). But a sufficient guarantee of trustworthiness is not the only criterion for admitting

20

evidence under Rule 807.[3] Although the text of Rule 807 does not explicitly require a declarant to be unavailable to admit the declarant's statement, the declarant's availability "re-enters the analysis" because the rule requires "that the proponent use reasonable efforts to procure the most probative evidence on the points sought to be proved." *State v. Hamilton*, 308 Ga. 116, 126 (4) (b) (839 SE2d 560) (2020) (citation and punctuation omitted). To admit the hearsay statements of Houseman and Thomas, Anglin would have to establish that their statements were "more probative on the point for which [they were] offered than any other evidence which [he] could have procured through reasonable efforts." Id. at 126-127 (4) (b) (citation and punctuation omitted).

---

[3] Rule 807 provides:

A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:

(1) The statement is offered as evidence of a material fact;

(2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

Anglin has not shown that he needed Houseman's and Thomas's statements to prove the point he says he wanted to make. At trial and at the hearing on his motion for new trial, Anglin argued that the evidence was needed to show that the investigation was "shoddy" and unreliable, and that he was not trying to prove the truth of the matter Houseman and Thomas asserted — that Daniel actually confessed to killing Ruark.[4] Despite his claims to the contrary, Anglin was able to present evidence to establish this point without getting into the substance of Houseman's and Thomas's statements. In his examination of Sheriff Berry and Investigator Hale, Anglin elicited testimony that the sheriff's office had received some information about Daniel but that the sheriff's office did not document this or investigate the claimed admission. Based on this evidence, Anglin's trial counsel highlighted to the jury in closing

---

[4] If Anglin were trying to prove this point, Daniel's testimony would be more probative than Houseman's and Thomas's statements. But, as discussed above, there is no showing that Daniel would have been unavailable at Anglin's trial, so Rule 807 would still not allow the statements at issue. Anglin does not argue that Houseman's or Thomas's statements were admissible under any other exception to the hearsay rule.

argument that the sheriff's office's investigation was inadequate, and questioned Investigator Hale's motive for not disclosing the information sooner.

There is no merit to Anglin's argument that the trial court erred in limiting his questioning of Sheriff Berry and Investigator Hale. The additional questioning sought by Anglin regarded inadmissible hearsay. Anglin presented evidence and arguments that he now claims he was prevented from presenting, but the jury was unmoved. Anglin presents nothing on appeal to show that an earlier disclosure would have made any difference. Therefore, he has failed to establish that the delayed disclosure materially prejudiced him or deprived him of a fair trial. See *Jones v. State*, 292 Ga. 593, 596 (3) (740 SE2d 147) (2013) (when audio recording of interview was disclosed after voir dire but before any witnesses testified, *Brady* was not violated because the defendant did not show that an earlier disclosure would have benefited his defense or that the delay deprived him of a fair trial); *Young v. State*, 290 Ga. 441, 443 (2) (721 SE2d 839) (2012) (failure to disclose report that purportedly

23

established the lead investigator's reputation for falsifying reports and lying under oath did not amount to a *Brady* violation because the report was inadmissible hearsay that the defendant failed to show would have led to admissible evidence); *Burgan v. State*, 258 Ga. 512, 513-514 (I) (1) (371 SE2d 854) (1988) (*Brady* not violated by late disclosure of witness's prior inconsistent statements where witness was extensively cross-examined about prior inconsistencies, earlier disclosure would not have benefited the defense, and the delay did not deprive the defendant of a fair trial or materially prejudice his defense).

3. Anglin argues that his trial counsel provided constitutionally ineffective assistance by failing to object to testimony by a GBI agent that, based on soil patterns, Ruark's grave had been dug with a flat shovel. Anglin argues that this testimony amounted to expert testimony and that the agent had not been qualified as an expert in soil pattern analysis. In rejecting Anglin's ineffectiveness claim, the trial court found that the testimony was admissible under OCGA §

24

24-7-701 (a) ("Rule 701 (a)"). We agree with the trial court on this point.

To prevail on his claim, Anglin must show both that his counsel's performance was constitutionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington,* 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Anglin must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Mims v. State*, 304 Ga. 851, 855 (2) (823 SE2d 325) (2019) (citation and punctuation omitted). "[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Richards v. State*, 306 Ga. 779, 781 (2) (833 SE2d 96) (2019) (citation and punctuation omitted). To demonstrate prejudice, Anglin must establish "a reasonable probability that, but for counsel's unprofessional errors,

25

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mims*, 304 Ga. at 855 (2) (citation and punctuation omitted). If Anglin fails to meet his burden in establishing one prong of the *Strickland* test, this is fatal to his claim. See *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015).

Rule 701 (a) provides that a lay witness may testify "in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Bullard v. State*, 307 Ga. 482, 491 (4) (837 SE2d 348) (2019) (citation and punctuation omitted). Anglin argues that Rule 701 (a) was not satisfied because the GBI agent's testimony was based on scientific, technical, or other specialized knowledge. But the record does not support Anglin's claim. The GBI agent testified about his observations of the grave site, and that its characteristics — sharp angles and flat, level surfaces in the soil — were more consistent with being dug by a flat shovel than a rounded

26

one. The agent's visual observations and conclusions drawn from those observations did not depend on "scientific, technical, or other specialized knowledge." See *Carter v. State*, 310 Ga. 559, 564 (2) (a) (852 SE2d 542) (2020) (a GBI agent's shoeprint analysis was a "basic" visual comparison that did not require specialized knowledge); see also *United States v. Williams*, 865 F3d 1328, 1342 (11th Cir. 2017) (an "opinion relating to the appearance of persons or things, . . . size, weight, and distance are prototypical examples of the type of evidence contemplated by [Federal] Rule 701" (citation and punctuation omitted)).[5] Trial counsel was therefore not deficient for failing to make a meritless objection. See *Lord v. State*, 304 Ga. 532, 540 (7) (a) (820 SE2d 16) (2018).

4. Anglin argues that he is entitled to a new trial due to the cumulative prejudice caused by the trial court's errors and his trial counsel's ineffectiveness. See *State v. Lane*, 308 Ga. 10, 13-14 (1)

---

[5] Because OCGA § 24-7-701 (a) was modeled on Federal Rule of Evidence 701, we look to decisions of the federal appellate courts, especially the United States Supreme Court and the Eleventh Circuit, for guidance when considering the meaning of this Georgia evidence rule. See *Bullard*, 307 Ga. at 492 (4).

(838 SE2d 808) (2020). With the exception of Anglin's argument regarding the denial of his motion for a continuance, we rejected every claim of trial court and trial counsel error. On Anglin's claim that the court erred in denying his request for a continuance, we found that Anglin failed to show harm. And this assumed error, individually harmless, is insufficient to establish cumulative error. See *Beck v. State*, 310 Ga. 491, 499 (3) n.5 (852 SE2d 535) (2020) (cumulative prejudice analysis does not apply when there are not multiple errors to aggregate).

*Judgment affirmed. All the Justices concur.*

Decided September 21, 2021.

Murder. Oconee Superior Court. Before Judge Haggard.

*Jessica I. Benjamin, Benjamin A. Pearlman*, for appellant.

*Deborah Gonzalez, District Attorney, Patrick A. Najjar, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.