NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 26, 2025

S25A0868.  FOSTER v. THE STATE.

PINSON, Justice.

Trever Andre Foster was convicted of felony murder and cruelty to children in connection with the death of Elisha Jones, a child.[1]

---

[1] Elisha died on May 3, 2012. On May 18, 2012, a Wayne County grand jury indicted Foster for felony murder predicated on cruelty to children in the first degree (Count 1) and cruelty to children in the first degree (Count 2). Foster was tried before a jury from May 20 to 21, 2013. He was found guilty of both counts. Foster was sentenced to life in prison without the possibility of parole for felony murder, and the other count merged for sentencing. Foster filed a timely motion for new trial through trial counsel, and also filed a timely pro se motion for new trial. (It is unclear whether the trial court recognized the pro se filing. In any event, the only claims of error that the trial court ultimately addressed were those that Foster asserted in his brief in support of his last amended motion for new trial.) On October 2, 2019, Foster filed an amended motion for new trial through new counsel. He later obtained different appellate counsel and filed a second amended motion for new trial on May 20, 2021, and then obtained a third appellate counsel and filed a third and a fourth amended motion for new trial on August 12, 2022 and June 13, 2023, respectively. Foster waived a hearing, and the trial court denied the motion for new trial, as amended, on February 15, 2024. Foster filed a timely notice of appeal. The case was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

On appeal, he contends that insufficient evidence supported his convictions and that the trial court erred by refusing to grant a continuance so that Foster could obtain a new attorney.

Those claims fail. The evidence was sufficient for a rational jury to find that Foster inflicted injuries on Elisha that caused his death, and to reject as unreasonable any hypothesis that Elisha's fatal injuries happened some other way. And the trial court acted within its discretion in denying Foster's request for a continuance, because there was no evidence that his counsel was unprepared for trial and Foster did not show any reason that a different counsel should be appointed. So Foster's convictions are affirmed.

1. Elisha was three years old. On May 2, 2012, he was living with his mother, Brittany Jones, and Jones's boyfriend, Foster. Elisha went to school that morning, and he came home in the afternoon, just as usual. Neither his teachers nor his mother noticed any unusual behavior or serious injuries.

That evening, Elisha stayed home with Foster while Jones worked an evening shift at her job. Midway through her shift, Jones

2

called home to check on Elisha. Foster said that everything was fine and that Elisha was in the bathtub, and Jones heard water splashing in the background. But about an hour later, at 9:30 p.m., Foster called Jones at work to report that Elisha's breathing was "sounding kind of funny." Elisha had asthma, and Foster did not know how to give him home treatment for an attack. Jones asked if she should come home to administer the treatment. But Foster said Elisha was "fine," so Jones stayed at work until her shift ended.

At 10:00 p.m., Foster picked up Jones from work. Foster had not brought Elisha with him in the car, and Jones was upset that Foster had left him home alone. When Foster and Jones got home, less than 20 minutes later, Elisha appeared to be asleep. Jones began to give him an asthma treatment. But after several minutes of treatment, Elisha did not wake up.

Jones took Elisha to the local hospital. Foster did not come with them. As Jones was on the way to the hospital, Foster called and told her that, while Jones was at work, Elisha had tripped and fallen as he was playing with the dog.

Jones arrived at the emergency room. Elisha was in critical condition, not breathing, and was rushed to treatment. While the hospital staff were working on him, they noticed bruising on his body. The staff told Jones what they had seen, and they called the police to report suspected child abuse.

Officers went to the family home. Foster was there, along with two friends. He was in the process of cleaning something that he said had spilled on the floor. Foster told the officers that Elisha had tripped while chasing the dog and had fallen down the steps outside the back door. The officers gave Foster permission to get a ride to the hospital with his two friends.

Meanwhile, another deputy had been dispatched to the hospital. The deputy saw that Elisha had what appeared to be "fresh" injuries to his body. The deputy and a detective then spoke with Jones, who relayed what she had heard from Foster about Elisha tripping while playing with the dog. While the officers were speaking with Jones, Foster arrived at the hospital, driven by the two friends. The officers heard Foster tell the friends not to leave, because, "I don't

trust this b**ch. I may be in handcuffs." The officers interviewed Foster, who repeated that Elisha had fallen while playing with the dog.

Elisha died the next day, at a different hospital to which he had been airlifted. A medical examiner did an autopsy and testified at trial about Elisha's injuries. Elisha had 81 separate bruises, cuts, and abrasions to his head, face, chest, abdomen, back, and limbs, including at least one that was consistent with being struck by "something long and narrow, like a stick." Some of these injuries were older and in some stage of healing, but many were acute. Elisha also had swelling of his brain and bleeding inside his skull, which the medical examiner testified was consistent with the head hitting a wall or being struck with a blunt instrument, although it could also be consistent with a fall. The medical examiner concluded that Elisha died from "battered child syndrome": he had "undergone a severe beating" and had died from acute injuries, primarily the injuries to his head.

Foster was arrested. He waived his *Miranda*[2] rights and gave an interview to police. In that interview, he told the same story again about Elisha falling while playing with the dog. But a little over a week later, Foster, from jail, asked to speak with a detective again. This time, Foster's story changed. Foster admitted that he had lied about Elisha tripping over the dog. Instead, Foster told the detective that some of Elisha's injuries were inflicted when Foster hit Elisha with a belt to punish him for defecating on himself. Foster said, "I beat that child and I'll take that charge," referring to the charge of cruelty to children. But Foster maintained that the fatal injuries to Elisha's head were "accidental." He said that Elisha had been jumping on the couch and "came off the couch and hit the living room floor."

Foster testified at trial, and there his story changed again. Foster said at trial that Elisha's fatal injuries were the accidental result of "horse playing." He said that he was picking up Elisha and

---

[2] *Miranda v. Arizona*, 384 US 436 (1966).

"throw[ing]" him playfully on the bed, and that when he threw Elisha on the couch, Elisha "bounce[d] off and hit[ ] the floor," face first. Elisha seemed "in a daze" afterward, so Foster put him under a lukewarm shower. But Elisha did not like the water running over his face, so he scratched at his face, injuring himself further. Elisha then defecated on himself. Foster took Elisha to the other bathroom to clean him up further in the tub, but then Elisha defecated again in the tub. So Foster got Elisha out of the tub, cleaned him up, dressed him in his pajamas, and laid him down in his bed. At that point, Elisha was "acting like regular," so Foster thought the emergency was over. Once Elisha was asleep, Foster went to pick up Jones from her job. But after they returned home, Elisha was not responsive, and at that point Jones took Elisha to the hospital.

With respect to the extensive bruising on Elisha's body, Foster denied inflicting any of the injuries. He testified that he did not know how the bruising got there, but he said he had seen Jones use physical discipline with Elisha, and he intimated that Jones caused the bruising, saying, "only one other person could have done that."

Foster also explained at trial why his story had changed. He said that Jones had been the one to come up with the "tripping over the dog" story. According to Foster, Jones called him from the hospital and told him that police were "asking questions," and further told him that she had told police that Elisha had fallen down the back porch stairs. Foster said that he initially repeated that story to police, because he knew that "if I was to tell my story, that everything would be pointing at me." But he changed his account when he was charged with murder. Foster said that a detective told him he was "going to have to take" a charge. Foster had seen the bruising on Elisha's body — although, again, he denied inflicting any of it — so he told the detective that he had disciplined Elisha with a belt, hoping that his story would fit the bruising and that he would be charged only with cruelty to children. Foster said that his trial testimony was, at last, the real truth, which "should have been heard from the beginning."

2. Foster claims that the evidence was not sufficient to sustain his convictions, either as a matter of constitutional due process or

under Georgia statutory law. He contends that the State did not prove beyond a reasonable doubt that Elisha died from injuries inflicted by Foster on May 2, 2012, and not from injuries inflicted by someone else on or before that day.

We evaluate a due process challenge to the sufficiency of the evidence by "viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Henderson v. State*, 317 Ga. 66, 72 (2023). "[C]onflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts" are for the jury to resolve. *Perkins v. State*, 313 Ga. 885, 891 (2022). And as a matter of Georgia statutory law, a conviction that rests only on circumstantial evidence cannot stand unless the evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Importantly, though, the evidence need not exclude every other "*conceivable* inference or hypothesis" — only every *reasonable* one. See *Bates v. State*, 317 Ga. 809, 814 (2023). Whether an alternative

9

hypothesis is "reasonable," and whether the circumstantial evidence excludes any such hypotheses, are questions for the jury, see id., and we will not disturb the jury's findings unless they are "insupportable as a matter of law," *Graves v. State*, 306 Ga. 485, 487 (2019).

Under those standards, the evidence was sufficient to support Foster's convictions. Foster was charged with felony murder predicated on cruelty to children in the first degree. To secure a conviction, the State had to prove beyond a reasonable doubt that Foster "maliciously cause[d] a child under the age of 18 cruel or excessive physical or mental pain," see OCGA § 16-5-70(b) (defining cruelty to children in the first degree), and that, "in the commission of" that felony act, Foster "cause[d] the death of" Elisha, see OCGA § 16-5-1(c) (defining felony murder). The evidence here authorized a rational jury to conclude that the State had met that burden. The evidence showed that Elisha had no serious injuries on the morning of May 2, 2012. But after he was alone with Foster for a few hours that evening, Elisha had dozens of bruises, scrapes, and abrasions, along with significant head trauma, all of which the medical examiner

10

characterized as a "severe beating" that caused Elisha's death. A jury could reasonably conclude that Foster must have inflicted those injuries, and it could reasonably disbelieve Foster's self-serving testimony that he did not. See *Snipes v. State*, 309 Ga. 785, 788–89 (2020) (jury could conclude that defendant was responsible, at least as a party to the crime, for the death of a child when the child suffered fatal injuries while in the care of the defendant and another person); *Walker v. State*, 308 Ga. 33, 35–36 (2020) (jury could conclude that the defendant was responsible for the death of a child when the child suffered fatal injuries while solely in the care of the defendant). And the jury could credit the medical examiner's opinion that those acute injuries "cause[d] the death of" Elisha. See *Eubanks v. State*, 317 Ga. 563, 569–71 (2023) (a predicate felony "causes the death" of a person for felony murder purposes if, among other things, the death is a "probable or natural consequence" of the felony).

Foster also contends that the evidence does not satisfy the circumstantial-evidence statute. But the statute does not apply here, because there was direct evidence of Foster's guilt: he admitted in

11

his interview from jail that "I beat that child." See *Walker v. State*, 314 Ga. 390, 394 (2022) (defendant's admissions are direct evidence of guilt). If any direct evidence of guilt is presented, the circumstantial-evidence statute does not apply. See *Bates v. State*, 317 Ga. 809, 815 (2023). Foster contends that his admission should be discounted because, under OCGA § 24-8-823, "[a] confession alone, uncorroborated by any other evidence, shall not justify a conviction." But assuming without deciding that Foster's statement was indeed a confession that required corroboration, and not a mere incriminating statement that would not require corroboration, see, e.g., *Davis v. State*, 316 Ga. 418, 422 (2023), Foster's admission *was* corroborated, both by the circumstantial evidence discussed above — the fact that Elisha had no serious injuries until he was left alone with Foster, and that the injuries he suffered under Foster's care were determined to be the cause of death — and by the fact that Foster changed his story several times to law enforcement, which could reasonably be understood as an attempt to conceal the truth. Evidence that is

circumstantial, or that merely indicates the defendant's consciousness of guilt, is sufficient to corroborate a confession under OCGA § 24-8-823. See *Baker v. State*, 319 Ga. 456, 460–61 (2024) (confession was corroborated by evidence including "the circumstances under which the victims were discovered and the various evidence of [the defendant's] consciousness of guilt"); *Hooper v. State*, 313 Ga. 451, 455–56 (2022) ("[N]o specific manner of corroboration of the confession is required, and corroboration in any particular is sufficient." (quotation marks omitted)).

3. Foster also contends that the trial court wrongfully denied his motion for a continuance so that he could have a different lawyer appointed for trial. In a related claim of error, he contends that the trial court violated his constitutional right to be appointed the counsel of his choice. We address these contentions in turn.

(a) On the first day of trial, Foster asked to fire his attorney, J.D. Blevins. Blevins, a public defender with the Brunswick Judicial Circuit Defender, had been involved with the case for only 10 days, since he had replaced Foster's original attorney, who was also with

the public defender's office. Foster said he did not believe Blevins had had enough time to prepare. But Foster's second-chair attorney, Jason Nix, who was also with the public defender's office, explained to the court that he had worked with Foster's original attorney in preparing for trial, and that Blevins had "received the prepared . . . case" from the original attorney. Nix also explained that Foster had been represented by the public defender's office all along, and that "the actual attorney who handles his case is determined by the chief public defender." Neither Blevins nor Nix said they were not prepared for trial. The trial court noted that the case had already been delayed by a week to give the attorneys time to prepare. Ultimately, the court denied the motion for continuance.

The decision whether to grant a continuance is committed to the sound discretion of the trial court, and the court may grant or deny a continuance "as the ends of justice may require." See *Blalock v. State*, 316 Ga. 330, 338 (2023). Such a decision will not be disturbed without a clear showing that the court abused its discretion. See *Kimbro v. State*, 317 Ga. 442, 446–47 (2023). And a defendant is

not entitled to a new trial based on the denial of a continuance unless he can show that he was harmed by that denial. See *Blalock*, 316 Ga. at 339.

The trial court here had discretion to find that the "ends of justice" did not require a continuance. The court heard that Blevins had received a "prepared" case from Foster's previous counsel, and that Nix was already very familiar with the case. Counsel did not say that they were unprepared. And Foster himself did not tell the court that he was dissatisfied with counsel, see *Greene v. State*, 274 Ga. 220, 221 (2001) (trial court had discretion to refuse to allow the defendant to obtain new counsel when, among other things, the defendant never expressed dissatisfaction with his attorney), or that there was any specific reason that a continuance would be helpful, such as to allow more time to retain an expert or subpoena a witness. He said only that he "[didn't] feel like [ten days was] enough for [Blevins] to be ready for a trial." We have upheld the denials of continuances against better-articulated reasons than that for granting one. See, e.g., *Reed v. State*, 314 Ga. 534, 549–51 (2022) (trial court

15

had discretion to deny continuance when defense stated that it needed time to "fully investigate" a "surprise" witness for the prosecution); *Harris v. State*, 314 Ga. 370, 373–74 (2022) (court had discretion to deny continuance when defense asked for more time to locate witnesses); *Keller v. State*, 308 Ga. 492, 501–02 (2020) (court had discretion to deny continuance when defense requested more time to retain a medical expert). And in any event, Foster has not shown on appeal how a continuance would have helped his case — as he must do to have his convictions reversed on that basis. See *Blalock*, 316 Ga. at 339. See also *Anglin v. State*, 312 Ga. 503, 510 (2021) (defendant who had been denied a continuance was not entitled to a new trial because he "fail[ed] to show how the lack of additional time harmed him"). This claim therefore fails.

(b) Foster also contends that the denial of a continuance deprived him of his right under the Sixth Amendment to the United States Constitution "to be represented by counsel of one's own choice."

The Sixth Amendment guarantees a criminal defendant the

16

right to "have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Applying that right, the United States Supreme Court has held that a defendant is entitled to a "fair opportunity to secure counsel of his own choice." *Luis v. United States*, 578 US 5, 11 (2016) (quoting *Powell v. State of Alabama*, 287 US 45, 53 (1932)). But a defendant who relies on counsel provided by the State, as Foster did at trial, is not entitled to have the counsel of his choice appointed. See id. at 12 ("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."). That said, it may be an abuse of discretion to deprive a defendant of the appointed counsel of his choice if there are "objective considerations favoring the appointment of the preferred counsel" and no "countervailing considerations of comparable weight." *Davis v. State*, 261 Ga. 221, 222 (1991).

Here, Foster relied on counsel provided by the State, so he had no constitutional right "to have the Government pay for his preferred representational choice." *Luis*, 578 US at 12. And no "objective considerations" favored appointing another counsel instead of

Blevins. See *Davis*, 261 Ga. at 222. But that is almost beside the point, because in any event, Foster did not *ask* for different counsel. He merely suggested that his current counsel, Blevins, may not have had enough time to prepare for trial. It is hard to see how a claim that one was deprived of one's counsel of choice could prevail when one did not even specify a counsel of choice. And as discussed above, Foster's suggestion that Blevins may have needed more time to prepare did not require the trial court to grant a continuance. This claim therefore fails.

*Judgment affirmed. All the Justices concur.*