304 Ga. 435
FINAL COPY

S18A1014. BROWN v. THE STATE.

PETERSON, Justice.

Perry Brown was tried and convicted of felony murder for the death of Willie Joe Beasley.[1] Brown appeals and argues that (1) the evidence was insufficient to support his conviction, (2) the trial court erred in admitting statements he made to police because those statements were involuntary and were given after he invoked his right to remain silent, and (3) the court erred in giving a jury charge on conspiracy. We affirm Brown's conviction because the evidence was legally sufficient, Brown's statements to police were voluntarily given and he did not unambiguously state he wanted the police interview to end, and there

---

[1] Beasley's body was found on August 18, 1998. On July 29, 2016, a Walton County grand jury indicted Brown for malice murder and felony murder. A jury trial was held in June 2017, after which the jury found Brown guilty of felony murder but not malice murder. The trial court sentenced Brown to life imprisonment. On February 27, 2018, the trial court denied Brown's motion for new trial, as amended. Brown filed a timely notice of appeal, and his case was docketed to this Court's April 2018 term and submitted for a decision on the briefs.

was sufficient evidence authorizing the jury instruction on the issue of conspiracy.

Viewed in the light most favorable to the verdict, the trial evidence shows that several of Beasley's co-workers found Beasley's body on Thursday, August 18, 1998, when they went to his residence to check on him after he had missed a few days of work. Beasley had been bound and gagged, a plastic trash bag covered his head, and his underwear, which was the only clothing he had on below the waist, was down around his knees. The medical examiner determined that Beasley died from asphyxiation and opined that, based on the level of decomposition, Beasley likely died about two days before his body was found, meaning he likely died on Tuesday, August 16. The medical examiner also observed that Beasley had a small tear in his anus that was consistent with the violent insertion of a foreign object.

Police spoke with several of Beasley's neighbors, including Brown, during the initial response to the crime scene. Brown said he briefly talked to Beasley on Tuesday, August 16. While processing the crime scene on August 18, police obtained several fingerprints from inside Beasley's residence; one print was later

identified as coming from Brown. Police also came to believe that a TV had been taken from Beasley's home, and a TV was later found in nearby woods.

Based on a lead, the police interviewed Brown in December 1998. He essentially repeated what he said before about his last interaction with Beasley, adding that he frequently helped Beasley install electronic equipment at his residence. After this interview, Brown, who was in jail at the time on unrelated charges, went back to his jail cell and talked to a fellow inmate, Mark Treadwell. Brown told Treadwell that he had been involved in a murder and that the victim had been sodomized. When Treadwell said that police would be able to identify the culprit based on DNA evidence, Brown became concerned that he would be charged with a crime. Brown told Treadwell that he did not have an alibi for the time of the crime. The fact that Beasley had been sodomized and the time of Beasley's death were not facts the police had shared with Brown. Treadwell later related this conversation to the authorities.

Police then obtained and executed a search warrant to collect DNA samples from Brown. While police escorted Brown to a private area to collect those samples, he unsuccessfully attempted to flee. But the testing of the DNA evidence was inconclusive.

The investigation went cold for a number of years, resuming in 2009 and again in 2016. Brown agreed to be interviewed by a detective on two different occasions in March 2016. During the interviews, Brown said he went to Beasley's residence on a Tuesday night and found Beasley lying on the floor and moaning with a trash bag over his head. Brown claimed that he unsuccessfully tried to remove the trash bag, left in a panic, and was too scared to call the police.

The detective also spoke to Delores Jackson in 2016. Jackson testified that she saw Brown, along with Jerry Jones, standing outside of Beasley's house at several times on the Tuesday before Beasley's body was found. Jackson saw the men around noon and again around 5:30 p.m. when she left to get food. When Jackson returned from dinner, Brown and Jones were smoking outside Beasley's open door. Jackson looked inside Beasley's residence, saw him lying on the floor, and promised to call the police when he asked for help. Before Jackson left, Jones — with Brown standing nearby — threatened to kill her if she called anyone. Jackson went home not knowing what to do because of Jones's threat. Later that night, at about 10:30 p.m., Jackson again saw Brown and Jones in the neighborhood. Jones was carrying a television that Jackson recognized as belonging to Beasley. Jones asked Jackson if she knew where he could sell the

4

television. Jackson acknowledged in her testimony that, although the police had interviewed her several times after Beasley's death, she did not mention seeing Beasley on the floor or seeing Brown with Jones outside of Beasley's residence throughout the day. Jackson explained that she had been too scared to say anything until 2016.

1. Brown argues that the evidence was insufficient to sustain his conviction for felony murder, because the evidence did not exclude every reasonable hypothesis except guilt. In particular, Brown argues that no eyewitness saw him or Jones enter Beasley's residence, gag Beasley, or put a trash bag over his head, and there were no hair samples or DNA evidence in Beasley's residence that belonged to Brown or Jones. We reject Brown's argument.

The fact that the evidence of guilt was circumstantial does not render it insufficient. Instead, for a conviction to be sustained upon circumstantial evidence, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Not every hypothesis is reasonable, however, and it is only reasonable hypotheses that the evidence must exclude. Merritt v. State, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009). Questions as to the

reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is insupportable as a matter of law. Akhimie v. State, 297 Ga. 801, 804 (1) (777 SE2d 683) (2015).

The evidence was legally sufficient here. The evidence shows that Beasley died on August 16, 1998. Brown and Jones were outside Beasley's home with the door open when Beasley was last seen alive asking Jackson for help, and Brown was next to Jones when Jones threatened Jackson's life if she called for help. Jackson later saw Brown and Jones with Beasley's television attempting to sell it. After police interviewed Brown about Beasley's death, Brown made inculpatory statements to a fellow inmate. Brown revealed to the inmate that he knew the victim had been sodomized and knew the victim's time of death, even though these were facts the police had not shared with Brown. Brown also became worried that he would be charged with a crime when a fellow inmate said that police would be able to identify the assailant based on DNA evidence, and Brown later attempted to flee as police prepared to collect DNA evidence from him. Given this evidence, the jury was authorized to conclude that the evidence excluded every reasonable hypothesis except that of Brown's guilt and to

6

therefore find Brown guilty of felony murder beyond a reasonable doubt. See Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Brown argues that the trial court erred in admitting his 2016 statements to police because the statements were involuntary and were made after he invoked his right to remain silent. We disagree.

The record shows that Brown agreed to be interviewed on March 22 and March 30, 2016, and the interviews were recorded. The detective advised Brown of his Miranda rights before each interview, and each time Brown acknowledged that he understood those rights.

During the first interview, while the detective questioned Brown about his fingerprint being found on the trash bag that covered Beasley's head,[2] Brown said, "Well, go ahead and book me in here, sir," and then said, "I'm ready, man" while standing and placing his hands behind his back as if he were about to be arrested. The detective asked Brown to sit down and talk. About thirty seconds after Brown sat down, he clutched his chest and appeared to be out of breath. The

[2] The evidence introduced at trial did not establish that Brown's fingerprint found inside Beasley's residence was located on the trash bag. The crime scene technician said he retrieved a fingerprint from the bag and from other locations at Beasley's residence. A fingerprint analyst compared these fingerprints to Brown's and Jones's fingerprints and said that there was a match to Brown, but did not say which of the recovered prints was a match.

detective repeatedly asked Brown if he needed an ambulance, and Brown replied, "No, sir, brother. I'd like to get it over with," and "Let's go ahead and finish."

Brown then told the detective about finding the victim on the floor but being unable to help him. After the detective challenged Brown's story as implausible, Brown asked about jail and then clutched his chest again, causing the detective to leave the room to call for an ambulance. The detective returned and continued to interview Brown for about another seven minutes until the paramedics arrived; Brown briefly clutched his chest for about five seconds but did not otherwise appear to be in physical distress during this period. The interview ended when the paramedics arrived. The detective told Brown the interview would continue at a later date and informed the paramedics that Brown was not under arrest.

Before resuming the interview about a week later, the detective asked if Brown felt well enough to continue the interview, and Brown said that he did. During the interview, the detective told Brown that he thought Brown put the garbage bag over Beasley's head. Brown replied:

> No. I'm ready to go and be locked up if you say I done it. No. I didn't do that bro. I'm not going to sit here and [say] I did it. No. I'm not going to sit — I'm not going to sit out here, no, sir.

After a brief exchange, Brown said he was scared and that he was trembling, and he then threw up his hands and appeared to labor to speak. Brown twice refused the detective's suggestion to call for an ambulance, and the detective ended the interview when Brown appeared as though he could not speak. The video recording shows that Brown no longer appeared to be in distress at the time the detective began leaving the room, and Brown joked with the detective as he walked out of the room.

(a) *Brown's statements were voluntarily made.*

Brown argues that his statements were involuntary. They weren't.

> In determining whether a defendant's statement was voluntary as a matter of constitutional due process, a trial court must consider the totality of the circumstances. The State bears the burden of demonstrating the voluntariness of a defendant's statement by a preponderance of the evidence.

Welbon v. State, 301 Ga. 106, 109 (2) (799 SE2d 793) (2017) (citations omitted). A trial court's credibility determinations and factual findings relating to the admissibility of statements must be upheld on appeal unless clearly erroneous. Turner v. State, 287 Ga. 793, 794 (3) (700 SE2d 386) (2010).

For both interviews, Brown voluntarily agreed to be interviewed and waived his Miranda rights. Brown was never handcuffed, threatened, or offered

9

anything in exchange for his cooperation. The detective repeatedly told Brown that he was not under arrest, and Brown was not arrested after either interview. These circumstances are generally enough to establish that a statement is voluntary. See, e.g., Norwood v. State, 303 Ga. 78, 82 (2) (a) (810 SE2d 554) (2018) (stating that giving Miranda warnings and getting a waiver is a "virtual ticket of admissibility" and concluding that statement preceding Miranda warning was voluntarily made given absence of threats, coercion, or offer of hope of benefit).

Leaving these details uncontested, Brown argues instead that his statements were involuntary because he was in significant pain as a result of either a stroke or heart attack. The trial court's order denying Brown's motion for new trial questioned the severity of Brown's medical complaints, citing Brown's refusal of medical care on multiple occasions and the detective's testimony that Brown appeared fine despite clutching his chest. But even if Brown was in pain, this fact "does not, in and of itself, render any statement made involuntary." Rogers v. State, 290 Ga. 18, 19 (1) (717 SE2d 629) (2011) (citation and punctuation omitted). In the absence of anything else that suggests involuntariness, the trial court did not err in concluding that Brown's statements were voluntarily made.

(b) *Brown did not unambiguously express desire to end the interviews.*

Brown argues that he clearly asserted his wish to end the police interviews, but the trial court correctly found that Brown did not unequivocally invoke his right to remain silent.

As stated above, Brown voluntarily agreed to be interviewed by the police, although he was read his <u>Miranda</u> rights. But even if Brown's voluntary interview could be viewed as a custodial interrogation, he did not unambiguously assert his Fifth Amendment right to remain silent. Police must scrupulously honor a suspect's right to remain silent if the person clearly and unambiguously states that he wants to end a custodial interrogation. <u>Berghuis v. Thompkins</u>, 560 U. S. 370, 381-382 (130 SCt 2250, 176 LE2d 1098) (2010); <u>Perez v. State</u>, 283 Ga. 196, 197 (657 SE2d 846) (2008). "But if a defendant equivocates in asserting the right, a police officer is under no obligation to clarify or to stop questioning." <u>Ridley v. State</u>, 290 Ga. 798, 802 (4) (725 SE2d 223) (2012) (citation omitted).

Here, when given multiple opportunities to end the first interview if he was not feeling well, Brown repeatedly said he wanted to finish the interview. Brown's statements during the first interview that the detective should "go ahead

11

and book" him because he was "ready" and Brown's actions indicating that he was ready to be arrested were not clear and unequivocal assertions of the right to remain silent. See Ridley, 290 Ga. at 801-802 (4) (defendant's repeated statements to take him to jail were not clear assertions). His statements at the second interview also were not clear assertions of the right. Brown merely said he was willing to be locked up if the detective believed he committed a crime but that Brown would not "sit there" and admit to something he did not do. In sum, Brown generally expressed a willingness to talk to the detective, repeatedly said he wanted to finish the interview rather than call for an ambulance, and never made an unambiguous statement that he wanted to stop speaking with the detective or wanted to remain silent. Under these circumstances, the trial court properly admitted the statements in question.

3. Brown next argues that the evidence did not authorize the trial court to give a jury instruction on conspiracy, and that he is entitled to a new trial as a result. We disagree.

Brown does not argue that the conspiracy charge was an incorrect statement of the law, only that no evidence supported it. But it is not error to charge on the subject of conspiracy, even if not indicted, when slight evidence

12

tends to show a conspiracy. See Pyatt v. State, 298 Ga. 742, 749 (4) (784 SE2d 759) (2016); Holmes v. State, 272 Ga. 517, 519 (529 SE2d 879) (2000). "[A] jury charge on the law of conspiracy can be supported by evidence of a common design as well as an express agreement to commit a crime." Shepard v. State, 300 Ga. 167, 170 (3) (794 SE2d 121) (2016) (citation and punctuation omitted). Where there is no evidence of an express agreement, an inference that two or more people tacitly came to a mutual understanding to commit a crime can be drawn from "the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." Edge v. State, 275 Ga. 311, 313 (6) (567 SE2d 1) (2002) (citation and punctuation omitted); see also Shepard, 300 Ga. at 170-171 (3).

There was more than slight evidence here to support the jury instruction on conspiracy. Jackson testified that Brown and Jones were together outside of Beasley's residence for most of August 16, 1998, the day the victim was last seen alive. After Jackson saw Beasley on the floor of his residence and promised him that she would call the police for help, Jones, with Brown standing nearby, threatened to harm Jackson if she called anyone. Later, Brown and Jones had Beasley's television and were attempting to sell it. This was sufficient evidence

13

for the jury to find that Brown and Jones had at least a tacit agreement to harm Beasley. See Shepard, 300 Ga. at 170-171 (3); Turner v. State, 275 Ga. 343, 345 (2) (566 SE2d 676) (2002).  And so the trial court was authorized to instruct the jury on conspiracy.

Judgment affirmed. Melton, C. J., Nahmias, P. J., Benham, Hunstein, Blackwell, and Boggs, JJ., concur.

Decided September 10, 2018.

Murder. Walton Superior Court. Before Judge Ozburn.

Anthony S. Carter, for appellant.

Layla H. Zon, District Attorney, Randal M. McGinley, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.