314 Ga. 637
FINAL COPY

S22A0684. THE STATE v. BURTON.

WARREN, Justice.

The State appeals the trial court's suppression of custodial statements 16-year-old Jeffrey Burton made during a video-taped interview with law enforcement officers who had arrested Burton for the murder of George Akins, Jr. The State contends that the trial court erred in concluding that Burton clearly, unequivocally, and unambiguously invoked his right to remain silent and that the State failed to show that Burton knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). For the reasons explained below, we do not decide whether the trial court erred in concluding that Burton clearly invoked his right to remain silent. However, we conclude that the trial court did not err in ruling that the State failed to meet its burden of showing that Burton knowingly and voluntarily waived

his rights under *Miranda,* a ruling that is supported by factual and credibility findings that are not clearly erroneous. We therefore affirm.

1. *Background*

(a) *Factual Background*

Viewing the evidentiary record in the light most favorable to the factual findings and to the judgment of the trial court, see *Walker v. State,* 312 Ga. 332, 336 (862 SE2d 542) (2021), the evidence shows the following. On October 23, 2017, when Burton was 16 years old, he was taken into custody for a murder that occurred two days earlier when someone exited a vehicle and shot into a group of people in a McDonald's parking lot. Detectives conducted a custodial interview of Burton that was video-recorded. Prior to trial, Burton filed a "Motion to Suppress All Statements Made by Mr. Burton to Police on October 23, 2017, and Fruits Thereof." On November 10, 2021, the trial court held a hearing on Burton's motion. The video recording of Burton's interview, along with testimony and evidence presented at the hearing, showed that

Burton was interviewed over a period of several hours by Detective Brittany Dobbs, who appeared to lead the interview, and Detective Christopher Ross, who assisted in the interview.[1]

At the time of his interview, Burton was a junior in high school. During the interview, one of Burton's wrists was handcuffed to a railing in the interview room, which was usually kept at a temperature around 68 degrees. After the detectives entered the interview room and introduced themselves, Detective Dobbs asked some preliminary questions about Burton's contact and other identifying information, and about his age and education. She also asked whether he was under the influence of any intoxicants, and she asked if he had any medical or mental issues that would prevent him from being able to speak to them. Detective Dobbs then advised Burton of his rights under *Miranda* and advised him that he had a

---

[1] The State called Detective Ross, but not Detective Dobbs, to testify at the hearing. A copy of the video-recorded interview, the signed waiver-of-rights form, a picture of Burton's birth certificate (showing his birth date), several search warrants related to the investigation, and records pertaining to Burton's delinquency history and past interactions with law enforcement were also admitted at the hearing.

right to have a parent present. The record indicates that officers did not initially contact Burton's parents to inform them about his detention. Detective Ross testified at the hearing on Burton's motion to suppress that Burton never asked to see his mother or for her to be brought in the interview room; that "[i]n determining whether to bring a juvenile's parents into the interview room, . . . [i]f he asked for his parents, his parents would be allowed in the room. And if he did not, we don't offer it"; and that Detective Ross did not notify Burton's parents that their son was in custody "[a]t any point in time during that day."

After Detective Dobbs explained Burton's rights to him, Burton confirmed that he understood them, and the following exchange occurred:

> DETECTIVE DOBBS: And having these rights in mind, are you willing to talk to us now?
> BURTON: Yeah, I don't want to.[2]

---

[2] At the hearing, Detective Ross—who watched the interview video during the court's lunch break before he was called to the witness stand—testified that he did not interpret this response as "a clear and unequivocal invocation of [Burton's] right to remain silent"; that if he had, the detectives "would have gotten up and left the room"; and that he believed "it was

DETECTIVE DOBBS: It's up to you.

BURTON: [brief, unintelligible response[3]]

DETECTIVE DOBBS: Okay.  Um, if you will just, um, I'll have to check those boxes "yes," and if you'll initial right there for me, and then just sign right there.

At that point, Detective Dobbs slid a waiver-of-rights form in front of Burton, Burton signed and initialed it,[4] and the interview began.

When asked, "Do you kinda know why you're here?" Burton responded, "Yeah, I heard stuff about it, but I don't like . . . ." Detective Ross then asked, "What have you heard? . . . Why do you

---

sufficiently ambiguous to warrant a follow[-]up response from Detective Dobbs."  However, after Detective Ross testified, the trial court said: "I'm going to state . . . for the record now that it seems to me like the detective's comments on what he heard on the video is based entirely or almost entirely on his listening to it this afternoon . . . on headphones and not based on his independent recall of what was said when he was in the room.  So I don't think his interpretation of it illuminates this at all, any more so than the Court's own listening to it.  So I'm going to rely on my own perception of what was said."

[3] Regarding this response from Burton, Detective Ross testified at the hearing, "[i]t's a mumble, but it is – it sounds like 'yeah,' but I can't say that definitively.  But I would say that the only reason [Detective Dobbs] would turn the paper around to him is if he indicated in the affirmative that he was ready to talk."  Burton's counsel objected to Detective Ross's testimony about why Detective Dobbs would turn the paper around on the ground that it was speculative, and the court sustained the objection.  Based on our review of the recording, it is unclear what Burton said at this point in the interview.

[4] Although Detective Dobbs had advised Burton that he had a right to have a parent present, it appears that a standard waiver form was used and that the standard form did not list that right, which is specific to juveniles.

think you're here right now? . . . Why do you think you're talking to us?" Burton responded, "That the police and stuff is looking for me . . . because somebody brought my name into . . . that thing that happened Saturday with George . . . that murder."

During the interview, Burton admitted to being with Trevon Jean-Baptiste, who was later charged with Akins's murder as Burton's co-defendant. Burton stated that he and Jean-Baptiste gave a ride to another person named "T" who allegedly got out of the car and shot into a group of people near McDonald's, but Burton denied any involvement in the shooting. Detective Ross later informed Burton that he was being charged with murder. Soon after that, Detective Ross leaned in close to Burton and raised his voice, saying, "this ain't no little kid s\*\*t. This is f\*\*\*\*\*g for real. . . . So this . . . is bulls\*\*t. . . . You need to f\*\*\*\*\*g tell me who the hell T is . . . ."

At other points in the interview, the detectives brought water to Burton, as well as a space heater when Burton—who can be seen in the video pulling his arms into the sleeves of his short-sleeve

6

shirt—said he was cold. The detectives also allowed Burton to use the restroom upon request. And although it is not entirely clear from the record whether police obtained an arrest warrant for Burton before or during the interview,[5] at the end of the interview, the detectives told him, "You're being charged. We can't stop that. That happened before you even got here," and provided him with a copy of the arrest warrant. They also informed Burton at that time that they had "told his parents what's going on."

(b) *The Trial Court's Order*

On November 22, the trial court entered an order granting Burton's motion in part and suppressing all of the statements Burton made during his custodial interview.[6] The trial court first noted that "the issues currently before the Court are whether [Burton] unequivocally invoked his right to silence or waived his

---

[5] Some of the search warrant applications pertaining to Burton's case indicated that his arrest warrant was obtained "[d]uring the interview." The State did not introduce Burton's arrest warrant into evidence at the hearing.

[6] The trial court denied Burton's motion to suppress to the extent Burton sought to suppress cell-phone evidence that he argued was the tainted "fruit" of his custodial interview. That ruling is not at issue in this appeal.

rights and whether [his] subsequent statements to police were voluntary." It then concluded that when Detective Dobbs asked Burton whether he wished to speak with detectives after he had been informed about his rights under *Miranda*, Burton's response of, "Yeah, I don't want to," was a "clear and unambiguous" invocation of his right to remain silent. Specifically, the court concluded that "when Det[ective] Dobbs asked [Burton] whether, having his *Miranda* rights in mind, he wished to speak to them, [Burton] shook his head in the negative and replied, 'Yeah, I don't want to.'" The court further concluded that

> [w]hile the State focuses on the "Yeah" to suggest that [Burton] was agreeing to speak to police, the Court takes this word to be more of an affectation of speech or a conversation filler rather than an affirmative response to Det[ective] Dobbs's question. Moreover, the Court cannot ignore what followed—an unambiguous "I don't want to."

It also emphasized that it "finds it particularly unlikely that [Burton] meant for his reply to have an affirmative connotation given that he was shaking his head 'no' as he made the statement."

With respect to Burton's later response to Detective Dobbs's

8

statement of "It's up to you," the court found that Burton's "verbal response . . . is unintelligible to the Court, even after multiple re-listenings"; that Detective Ross "did not recall what [Burton] said, nor could he make it out upon listening to the recording"; and that Burton "appeared to shrug at the time he made the unclear utterance, and his body language was not that of an individual who seemed open to conversation." Given that Detective Dobbs "did not make any further attempts to gain clarity on whether [Burton] wished to speak with them, but rather pushed the constitutional rights form toward [Burton] to get him to agree to waive his rights," the trial court then moved to an analysis of whether Burton voluntarily waived his rights under *Miranda* after he invoked his right to silence.

Because Burton was a juvenile at the time his interview was conducted, the trial court considered the nine factors set forth in *Riley v. State*, 237 Ga. 124 (226 SE2d 922) (1976), to determine whether Burton voluntarily waived his rights. Those factors are the:

"(1) age of the accused; (2) education of the accused; (3)

knowledge of the accused as to both the substance of the charge . . . and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogation; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date."

*Riley*, 237 Ga. at 128 (quoting *West v. United States*, 399 F2d 467, 469 (5th Cir. 1968)). The court added that "'[i]n the specific context of evaluating whether a juvenile defendant's rights were knowingly and voluntarily waived, the inquiry "depends on the totality of the circumstances and the state has a heavy burden in showing that the juvenile did understand and waive his rights."'" *Lester v. State*, 310 Ga. 81, 85 (849 SE2d 425) (2020) (citation omitted).

The court made specific findings regarding each of the *Riley* factors and concluded that "[c]onsidering the totality of the circumstances, in particular the age of [Burton], the length of the interview, the fact that [he] was not informed of the charges against him or that an arrest warrant had already been obtained by the time

10

the interview began, and the absence of a parent during the interview, the Court finds that the State did not meet its burden to show that [Burton] knowingly and intelligently waived his *Miranda* rights."[7]

The State did not appeal the trial court's ruling when it was issued and instead proceeded to a jury trial the following week, which was held from November 29 to December 6, and which resulted in a hung jury and mistrial. After entry of the mistrial order on December 8 (nunc pro tunc to December 6), and within the 30 days to appeal provided for by OCGA § 5-6-38 (a), the State filed a notice of appeal.

2. *Standards of Review*

"Generally, when reviewing a trial court's ruling on a motion to suppress, this Court must accept the trial court's factual findings unless they are clearly erroneous," and then independently apply the law to those facts to determine if the trial court erred in its

---

[7] The trial court's specific findings are detailed more fully below in Division 4.

suppression ruling. *Dozier v. State*, 306 Ga. 29, 33 (829 SE2d 131) (2019). See also *State v. Rodriguez*, 274 Ga. 728, 728 (559 SE2d 435) (2002). In assessing the trial court's suppression ruling, therefore, "'an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court.'" *Walker*, 312 Ga. at 336 (quoting *State v. Clark*, 301 Ga. 7, 8 (799 SE2d 192) (2017)). In so doing, however, we may "'consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility such as facts indisputably discernible from a videotape.'" *Walker*, 312 Ga. at 336 (quoting *Clark*, 301 Ga. at 8). "On the other hand, to the extent that legally significant facts were proved by evidence other than the video recording, the trial court as factfinder was entitled to determine the credibility and weight of that other evidence." *State v. Abbott*, 303 Ga. 297, 299 (812 SE2d 225) (2018).

With respect to a defendant's invocation of his right to remain silent, "[w]e have explained that 'when a person in the custody of law enforcement officers unambiguously and unequivocally invokes

12

his right to remain silent in connection with their interrogation, the interrogation must cease immediately.'" *Walker*, 312 Ga. at 335 (citation omitted). "'Whether an invocation is unambiguous and unequivocal depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.'" Id. (quoting *Davidson v. State*, 304 Ga. 460, 469 (819 SE2d 452) (2018)) (punctuation omitted).

Finally, in evaluating whether a defendant knowingly and voluntarily waived his rights under *Miranda*, the State bears the burden of showing by a preponderance of the evidence that under the totality of the circumstances, the defendant understood and waived his rights. See *Huffman v. State*, 311 Ga. 891, 893-894 (860 SE2d 721) (2021). See also *Williamson v. State*, 305 Ga. 889, 893 (827 SE2d 857) (2019) ("'Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude

13

that the *Miranda* rights have been waived.'") (citation omitted). In the context of evaluating whether juveniles have waived their rights under *Miranda*, this Court has held that the question of a voluntary and knowing waiver "'depends on the totality of the circumstances and the state has a heavy burden in showing that the juvenile did understand and waive his rights.'" *Lester*, 310 Ga. at 85 (quoting *Riley*, 237 Ga. at 128). This Court has identified the nine "*Riley* factors," set forth above, to consider in evaluating whether a juvenile has knowingly and intelligently waived his rights under *Miranda*. See *Riley*, 237 Ga. at 128.[8] Because we owe "substantial deference" to the trial court's factual findings regarding disputed questions of fact material to whether a defendant voluntarily waived his rights under *Miranda*, see *Abbott*, 303 Ga. at 302, the trial court's findings

---

[8] We note that some members of this Court have recently expressed "doubts about how a trial court is to make, and an appellate court is to review, a ruling based on a *nine*-factor, totality-of-the-circumstances test," *Daniels v. State*, 313 Ga. 400, 418 (870 SE2d 409) (2022) (emphasis in original) (Nahmias, C. J., concurring specially in part)—a sentiment that is echoed in Justice Pinson's concurring opinion in this case. Nonetheless, *Riley* remains controlling authority on this issue, and we decline the State's invitation to overrule it at this time.

as to each of the nine *Riley* factors "must be upheld on appeal unless clearly erroneous," *Bedford v. State*, 311 Ga. 329, 334 (857 SE2d 708) (2021). Keeping these principles in mind, we turn to the State's enumerations of error.

3. The State contends that the trial court erred in finding that Burton clearly, unequivocally, and unambiguously invoked his right to remain silent. The State specifically argues that when Detective Dobbs read Burton his rights under *Miranda* and then asked Burton if he was willing to talk, Burton's response of, "Yeah, I don't want to," along with his "equivocal" body language, was not an unambiguous and unequivocal invocation of his right to silence. The State further argues that because a reasonable officer would perceive Burton's response as ambiguous and equivocal, Detective Dobbs's follow-up statement, "It's up to you," was a permissible attempt to seek clarification as to whether Burton wished to exercise his right to remain silent. The State contends that Burton then replied "yeah," initialed and signed the waiver-of-rights form, and proceeded to answer the detectives' questions without making any

effort to cut off questioning, showing that Burton did not intend to invoke his right to silence.

Burton, on the other hand, contends that the trial court correctly concluded that he unambiguously and unequivocally invoked his right to silence when he responded, "Yeah, I don't want to," when Detective Dobbs asked whether he was willing to talk, and that his invocation of that right was not honored when the detectives did not cease questioning him immediately. Burton also disputes the State's claim that he replied "Yeah," in response to Detective Dobbs's follow-up statement, "It's up to you," pointing out that the trial court found Burton's reply "unintelligible."

Although there is a significant dispute between the parties about what Burton meant when he said "Yeah, I don't want to," in response to Detective Dobbs's question of whether he was willing to talk—and about what Burton said in reply to Detective Dobbs's follow-up statement—we need not evaluate the correctness of the

16

trial court's conclusion to resolve this appeal.[9]  That is because—in addition to suppressing Burton's custodial statements on the basis that Burton's initial response of, "Yeah, I don't want to," was a "clear and unambiguous" invocation of his right to silence that was not honored—the trial court also issued an additional ruling that Burton's statements must be suppressed because the State failed to meet its burden of showing that Burton knowingly and voluntarily waived his rights under *Miranda.*  And as explained more below, we affirm the trial court's ruling on that basis.  See *Ellison v. State*, 313 Ga. 107, 107-108 (868 SE2d 189) (2022) (affirming trial court's

---

[9] The special concurrence contends that we need not reach the question of whether Burton's waiver of rights was voluntary, based on the theory that this Court owes deference to the trial court's finding that Burton unequivocally invoked his right to silence.  In so doing, the special concurrence assumes the answer to a complex question that we need not and do not decide today: what standard of review this Court applies when reviewing the very same videotape that was available to the trial court, when the conduct, words, or actions depicted in the videotape are not indisputably discernible from the tape alone, and when that video tape was the exclusive source of evidence for the trial court's findings and legal conclusions.  Compare *Walker*, 312 Ga. at 336 (deferring to trial court's conclusion as to invocation where "the words that Appellant said during the pertinent portions of the recording [were] by no means 'indisputably discernible'" and the trial court's finding "was supported by the trial court's own repeated review of the recording as well as the testimony of three witnesses").

17

ruling because "the record support[ed] at least one of the trial court's two bases for its ruling"); *State v. Hamilton*, 308 Ga. 116, 124, 128 (839 SE2d 560) (2020) (affirming trial court's ruling where, although the trial court abused its discretion in admitting former testimony under OCGA § 24-8-804 (b) (1), "that conclusion [did] not end our review . . . because after conducting its Rule 804 (b) (1) analysis, the trial court made an alternate holding" that the former testimony was admissible under OCGA § 24-8-807, which was not an abuse of discretion).

4. The State contends that, considering the totality of the circumstances, the trial court erred in concluding that the State failed to show that Burton knowingly and voluntarily waived his rights under *Miranda*. As noted above, before concluding that the State failed to meet its burden, the trial court set forth the nine *Riley* factors and made findings as to each. Specifically, the trial court found that (1) Burton was 16 years old; (2) he had just started his junior year in high school; (3) he was advised of his rights under *Miranda*, and although he knew police wanted to speak with him

18

about the shooting, there was no indication that he knew he was a suspect or that police had obtained an arrest warrant for murder; (4) although he was advised of his right to have a parent present, he never consulted with any parent or relatives, and "Det[ective] Ross testified that he did not contact [Burton's] parents to let them know that he was in custody or why he was in custody"; (5) police had obtained an arrest warrant before the interview began, but this was not revealed to Burton until the end of the interrogation; (6) the interrogation methods were "somewhat misleading and deceptive, as acknowledged by Det[ective] Ross at the hearing," "voices were occasionally raised and foul language used and directed at [Burton], but the tactics were not particularly abusive or coercive," and Burton was shackled to a railing in a "very cold" room; (7) the interview "was lengthy, even in the context of an adult interrogation"; (8) Burton "invoked his right to silence and clearly indicated that he did not wish to speak to police," and "[t]he record is devoid of evidence as to whether [he] declined to give[ ] any statements on earlier occasions"; and (9) although Burton had never

19

"repudiated the statement he gave to police on October 23, 2017, likely because he never confessed to the shooting and his statements were largely exculpatory with respect to his own involvement, he ha[d] pleaded not guilty to the charges against him."

In support of its contention that Burton's waiver was knowing and voluntary, the State argues the following: Burton was almost 17 years old at the time of his interview; was in the eleventh grade; appeared to listen attentively to Detective Dobbs and confirmed that he understood his rights; responded, when asked, that he would talk to Detective Dobbs; indicated on the waiver form that he waived his rights, and then answered the detectives' questions without objection; knew that police wanted to talk to him about a murder (irrespective of whether he understood at first that he was a suspect); was told that he could have a parent present; and was "streetwise," in that he had extensive past involvement with law enforcement and the justice system, including having been read his rights at least twice before during past interviews related to other incidents.

The detailed factual findings set forth in the trial court's order reveal that it did not rely exclusively on the videotape of Burton's custodial interview in making its findings. Rather, it also considered other evidence presented at the hearing on Burton's motion to suppress, such as Detective Ross's testimony, the standard waiver-of-rights form given to Burton that was not specifically tailored for juveniles, records related to Burton's delinquency history and previous interactions with law enforcement, search warrant applications, and Burton's birth certificate. Indeed, the trial court specifically stated at the hearing that "I've still got to look at all the other factors and the totality of the circumstances to find out whether this was voluntary. And I think that gets done . . . by listening to the statement as a whole and considering the factors of detention and the evidence in front of me right now about when he was brought in that room and all of that stuff. . . . I think that's a decision that I can make after listening to the entire interview and considering all the circumstances." Based on its review of all of the evidence presented, the trial court concluded that, considering the

21

totality of the circumstances, the State did not meet its burden of showing that Burton knowingly and intelligently waived his rights under *Miranda*.

Evidence presented at the hearing on Burton's motion to suppress—including but not limited to the video recording of the interview—supported the trial court's factual findings as to each of the nine *Riley* factors. To that end, the State does not dispute the trial court's finding regarding the first *Riley* factor—that Burton was 16 years old—which was supported by a photograph of Burton's birth certificate that the State admitted as Exhibit Five at the motion-to-suppress hearing and was one of the specific findings that the court noted "in particular" in reaching its conclusion that the State failed to meet its burden of showing that Burton knowingly and intelligently waived his rights under *Miranda*. Nor does the State dispute the trial court's finding regarding the second factor— that Burton had just started his junior year of high school. With respect to the third factor, the State does not dispute that there was no indication Burton initially knew that he was a suspect in the

22

murder—a finding that was supported by Detective Ross's testimony; the State merely points out, as the trial court did, that Burton at least knew that the detectives wanted to talk to him about a murder.

Regarding the fourth factor, the trial court's finding that Burton did not consult with a parent or relative and that Detective Ross did not contact Burton's parents was based, at least in part, on Detective Ross's testimony that he did not notify Burton's parents that their son was in custody or why he was in custody "[a]t any point in time during that day." See *Oubre v. Woldemichael*, 301 Ga. 299, 305-306 (800 SE2d 518) (2017) (noting, in analyzing the *Riley* factors in the context of due process voluntariness, that "[a]lthough a parent's absence or presence is not dispositive of the question of whether a juvenile's confession is admissible, it is a significant factor in the analysis") (citation omitted). Cf. *Daniels v. State*, 313 Ga. 400, 413 (870 SE2d 409) (2022) ("[A] parent's presence, although not required, is a significant factor in support of a finding of waiver.") (citation and punctuation omitted). Notably, the trial court

23

emphasized "in particular" the "absence of a parent during the interview" in its totality-of-the-circumstances analysis.

As for the fifth factor, the trial court found that an arrest warrant had been obtained before the interview began, even though there was some inconsistency in the evidence on this point. But the trial court was authorized to weigh search warrant applications indicating that Burton's arrest warrant was obtained "[d]uring the interview" against Detective Ross's statement to Burton at the end of the video-recorded interview that Burton was "being charged" and "[t]hat happened before you even got here," and also to credit Detective Ross's testimony acknowledging that Burton was not "actually informed of [the arrest warrant's] existence" until "the end of the interview" and that "up until then he wouldn't have known about it," which appears to acknowledge that the arrest warrant had at least been obtained at some point before or during the time of the interview.

With respect to the sixth factor, the trial court expressly credited Detective Ross's testimony in determining that the

24

"techniques employed during the interview were somewhat misleading and deceptive," even though they "were not particularly abusive or coercive." The trial court noted, however, that Burton was "shackled to a railing in the interview room" during his interview, a finding that was supported by the video recording of Burton's interview and also by Detective Ross's testimony. Moreover, in finding that the interview room was "very cold"—the type of factual finding that we generally review with "substantial deference," *Abbott*, 303 Ga. at 302—the trial court expressly considered Detective Ross's testimony about the room's temperature and also pointed to the video recording's depiction of Burton pulling his arms into his shirt and sitting in a way that appears to indicate he was trying to stay warm. As for the seventh factor, Detective Ross testified that Burton was held in the interview room for "a good part of the day, probably," and the State does not dispute the trial court's finding that the interview "was lengthy, even in the context of an adult interrogation."

With respect to the eighth factor, even apart from the trial

court's ultimate determination that Burton "invoked his right to silence"—a conclusion we expressly decline to evaluate today—the court also found as part of its *Riley* analysis that Burton "clearly indicated that he did not wish to speak to police." And that point was consonant with the trial court's earlier findings that Burton "shook his head" while saying, "Yeah, I don't want to," and that after Burton responded to Detective Dobbs after she advised Burton of his rights under *Miranda*, Burton "appeared to shrug . . . and his body language was not that of an individual who seemed open to conversation." Moreover, the trial court also found with respect to the eighth factor that "[t]he record is devoid of evidence as to whether [Burton] declined to give[ ] any statements on earlier occasions," suggesting that it was not persuaded by evidence the State presented about Burton's delinquency history and prior interactions with law enforcement, which the State offered to show that Burton was "streetwise" and had been read his rights under *Miranda* on previous, unrelated occasions.

And regarding the ninth factor, the trial court's finding that

26

Burton had not repudiated the custodial statements he made to the detectives, while also acknowledging that Burton had pleaded not guilty to the charges against him, was an accurate recitation of what had happened in the case at that point in time. See *Daniels*, 313 Ga. at 415 (rejecting defendant's assertion that entering a plea of not guilty constituted a repudiation of his statements).

The record thus shows that the trial court reviewed and weighed the evidence presented at the motion-to-suppress hearing, and that it also made factual and credibility determinations in reaching its ultimate conclusion that, considering all of the *Riley* factors, the State failed to meet its burden of establishing that Burton knowingly and voluntarily waived his rights under *Miranda*. Moreover, in considering the totality of the circumstances, the trial court placed great weight "in particular" on the factors of Burton's age, the length of the interview, law enforcement's failure to inform Burton of the charges against him or that an arrest warrant had already been obtained for him, and the absence of either of Burton's parents. See *Daniels*, 313 Ga. at 417-418 (noting that "although

27

some [of the *Riley*] factors weigh against the trial court's ultimate determination that Daniels's statements were admissible under *Riley*, we cannot say that the trial court erred" "under the totality of the circumstances"). See also *Goins v. State*, 310 Ga. 199, 201 n.2 (850 SE2d 68) (2020) (noting, where the record did not support some of the trial court's factual findings underlying its rejection of the defendant's speedy trial claim, that given the trial court's "other findings regarding the reasons for delays in the case and regarding the other *Barker-Doggett* factors, which the record supports, it is clear that those two erroneous findings were not material to the court's ultimate conclusion").[10] Given the undisputed aspects of the evidence; the trial court's extensive findings; and the credibility

---

[10] Contending that the trial court erred in ruling that the State failed to meet its burden of showing that Burton waived his rights under *Miranda*, the State cites a litany of cases in which this Court and the Court of Appeals have held that juveniles knowingly and voluntarily waived their rights. See, e.g., *Allen v. State*, 283 Ga. 304, 305-306 (658 SE2d 580) (2008) (15- and 16-year-olds knowingly and voluntarily waived rights); *Green v. State*, 282 Ga. 672, 674 (653 SE2d 23) (2007) (16-year-old knowingly and voluntarily waived rights); *Boyd v. State*, 315 Ga. App. 256, 266 (726 SE2d 746) (2012) (Blackwell, J., concurring in part and dissenting in part). But a multi-factor test, such as the one this Court has historically used from *Riley*, is inherently a fact-and-circumstance-specific analysis, and here it leads us to conclude that the cases the State cites are distinguishable from this one.

28

determinations the trial court made after listening to witness testimony and weighing the evidence, we cannot say that the trial court's factual and credibility findings were clearly erroneous, or that the trial court erred in concluding that the State failed to meet its heavy burden of showing that, under a totality of the circumstances in this case, Burton knowingly and intelligently waived his rights under *Miranda*. We therefore conclude that, based on the specific facts and circumstances presented in this case, the trial court did not err in granting Burton's motion to suppress. See *Bedford*, 311 Ga. at 334-335 (holding that "because the trial court grounded its denial of Bedford's motion to suppress on the *Riley* factors . . . [and b]ecause these findings were not clearly erroneous and the trial court properly relied upon the *Riley* factors, we see no error in the trial court's denial of Bedford's motion to suppress").

*Judgment affirmed. All the Justices concur, except Colvin, J., who concurs in judgment only, and LaGrua, J., who dissents.*

PINSON, Justice, concurring.

As the Court notes, some members of our Court have recently expressed "doubts" about the juvenile-specific test the trial court applied in this case, which comes from *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976). *Daniels v. State*, 313 Ga. 400, 418 (870 SE2d 409) (2022) (Nahmias, C. J., concurring specially in part). Count me as a doubter, too. Even putting to one side any concerns with requiring "a trial court . . . to make, and an appellate court . . . to review, a ruling based on a *nine*-factor" test id. (emphasis in original), *Riley* appears to be out of step with U.S. Supreme Court precedent. In *Fare v. Michael C.*, 442 U.S. 707 (99 SCt 2560, 61 LE2d 197) (1979), the Court held that the test for whether a person has waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), is the same for juveniles as it is for adults, and it requires a "totality-of-the-circumstances approach" that "includes," but is not limited to, "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him,

30

the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id. at 725. By contrast, *Riley* requires a test that is specific to juveniles and limited to nine particular factors. See *Riley*, 237 Ga. at 128. And some of those factors not only diverge from *Fare*'s listed considerations but also seem irrelevant to the waiver question—for example, the length and method of the interrogation, which in many cases occurs *after* a person has made the alleged waiver of rights at issue. See id.[11]

I have found no explanation for why we apply *Riley* instead of *Fare*, but the best guess is some combination of happenstance and inertia. *Riley* was decided in 1976, which happened to be three years before *Fare* squarely explained how to assess whether a juvenile's waiver of rights under *Miranda* was knowing and voluntary. Lacking that guidance, we instead borrowed a test from a 1968

---

[11] Consider this case, for example. The trial court faithfully applied *Riley*'s factors, including those that required it to consider the length and method of the interrogation. But the arguments that Burton was held in the interview room for "a good part of the day" or that the techniques used were "somewhat misleading and deceptive" do not seem to me to have much of anything to do with the voluntariness of Burton's initial waiver of his rights, which he gave just a few minutes into the interview.

federal court of appeals case, *West v. United States*, 399 F2d 467, 469 (5th Cir. 1968), which had collected these factors from cases that mostly pre-dated *Miranda*. And then we kept traveling under that test, even after *Fare* was issued.

For now, *Riley* is the test the great weight of our precedent required the trial court to apply,[12] and the Court's opinion rightly concludes that the trial court did not abuse its discretion in applying it under the specific facts and circumstances of this case. So I concur fully. But in an appropriate case, we should consider whether a course correction, or at least a clarification, is warranted. I am authorized to state that Chief Justice Boggs, Justice Warren, Justice Bethel, and Justice McMillian join in this concurrence.

---

[12] Our cases are not entirely consistent in this regard. Although we have applied *Riley* dozens of times, we have cited *Fare* twice in this context since it was issued. See *State v. Lee*, 298 Ga. 388, 389 (782 SE2d 249) (2016); *Norris v. State*, 282 Ga. 430, 431 (651 SE2d 40) (2007). And in at least one case, *State v. Rodriguez*, 274 Ga. 728 (559 SE2d 435) (2002), we applied *Riley* in a totality-of-the-circumstances, non-exclusive-factors approach that looks more like *Fare*.

COLVIN, Justice, concurring specially.

I agree with the majority opinion's ultimate conclusion that the trial court did not err in granting Burton's motion to suppress his custodial statement. However, because the trial court made express findings that Burton unequivocally invoked his right to silence, and that the record contained no credible evidence that could show officers scrupulously honored that invocation or that Burton reinitiated contact with the detectives, Burton's custodial statement was inadmissible. For these reasons, I see no need to analyze the voluntariness of Burton's statement. Accordingly, I concur only in the judgment of the Court.

It is well established that, "[a] person being subjected to custodial interrogation may at any time express his or her desire to remain silent and, thereby, end the interrogation." *Green v. State*, 275 Ga. 569, 571-572 (2) (570 SE2d 207) (2002). "An accused will be found to have unambiguously and unequivocally asserted his right to remain silent where he declares that he is finished talking or otherwise expresses the clear desire for police questioning to cease."

33

*Mack v. State*, 296 Ga. 239, 242 (1) (765 SE2d 896) (2014) (punctuation omitted). If a defendant "clearly and unambiguously states that he wants to end a custodial interrogation," then police officers "must scrupulously honor" that invocation. *Brown v. State*, 304 Ga. 435, 440 (2) (b) (819 SE2d 14) (2018) (citations omitted). *Michigan v. Mosley*, 423 U. S. 96, 104 (96 SCt 321, 46 LE2d 313) (1975) ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends[,] under *Miranda*[,] on whether his right to cut off questioning was scrupulously honored." (citation and punctuation omitted)).

Here, the trial court found, based upon all of the evidence admitted at the *Jackson-Denno* hearing, that Burton unequivocally invoked his right to remain silent. That ruling was not clearly erroneous. The record shows, and the parties do not dispute, that Detective Dobbs asked Burton, "[with] these rights in mind, are you willing to talk to us?" Burton replied, "Yeah, I don't want to." The trial court determined that Burton shook his head "no" while making that statement. These facts are materially indistinguishable

34

from other cases in which this Court has found an unequivocal invocation of the right to remain silent. See e.g., *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005) (trial court properly found unequivocal invocation of right to remain silent where, in response to GBI agent's clarifying question, the defendant "clearly shook his head in the negative" and stated that he wanted "to just sit back and get his charges and just go back"). See also *Ensslin v. State*, 308 Ga. 462, 470 (2) (c) (841 SE2d 676) (2020) (finding appellant unequivocally invoked his right to remain silent when, in the middle of the interview, he said, "You know, that's it. I ain't got nothing else to say. . . . If you're going to charge me, you take me and charge me," and "I don't want to talk to nobody. Like I said, if you're going to charge me, charge me. And let's go"); *Davidson v. State*, 304 Ga. 460, 468-469 (4) (819 SE2d 452) (2018) (holding that the defendant unequivocally invoked his right to silence when he repeatedly said that he had "nothing to say"); *Mack*, 296 Ga. at 242 (1) (finding unequivocal assertion of right to remain silent where defendant stated during custodial interview "I'm done. I have no more to say.

35

I'm done. Let's ride"); *State v. Moon*, 285 Ga. 55, 57 (673 SE2d 255) (2009) (finding unequivocal assertion of the right to remain silent when the defendant, in the middle of custodial interview, stated, "I ain't got no more to say. I mean, that is it"); *Green*, 275 Ga. at 572-573 (2) (defendant's statement of "That's cool . . . I don't want to talk," in response to detective's statement that "We're not gonna be able to talk to you anymore," was an unequivocal invocation of right to remain silent). Given the evidence presented at the hearing, the trial court was authorized to find that Burton unequivocally invoked his right to remain silent.

Next, the State had the burden to prove by a preponderance of the evidence either that (1) the detectives "scrupulously honored" the invocation of the right or (2) Burton "voluntarily waived that right by reinitiating contact with the detective[s]." *State v. Hinton*, 309 Ga. 457, 461 (2) (847 SE2d 188) (2020). See also *State v. Pauldo*, 309 Ga. 130, 133 (2) (844 SE2d 829) (2020) (listing factors trial courts consider when determining if a defendant's right to remain silent was scrupulously honored by officers). Here, the trial court

36

noted that the evidence presented by the State regarding what happened between Burton's invocation and his subsequent waiver was "frustratingly" unclear. Although the State introduced testimony from Detective Ross about the post-invocation exchange, the court did not credit that testimony. The court's credibility determination was not clearly erroneous because Detective Ross testified that he did not have a clear or independent memory of what had occurred after Burton invoked his right to remain silent, and the detective "admitted that he was unable to understand what [Burton] was saying in the [relevant portions of the] recording."[13] *Hinton*, 309 Ga. at 461 (2) (explaining that, where the trial court questions the credibility of a detective's testimony at a *Jackson-Denno* hearing, "specifically citing the vague nature of his testimony and the detective's professed lack of memory on key points," it was for the trial court, not this Court, to determine the detective's credibility). See also *Miller v. State*, 288 Ga. 286, 289 (2) (702 SE2d

---

[13] Presumably, the State could have provided the trial court with more clarity by calling Detective Dobbs to testify as to her recollection of the interaction. Yet, inexplicably, the State chose not to do so.

37

888) (2010) ("[T]he trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony." (citation and punctuation omitted)).

That left the trial court with the video recording of the interview to determine what occurred between Burton's invocation of his right to remain silent and his subsequent waiver of his rights. Based on its own review of the video recording, the trial court found that Burton's post-invocation exchange with Detective Dobbs was "unintelligible." Although we generally defer to a "trial court's findings on disputed facts unless clearly erroneous," *Mack v. State*, 296 Ga. at 241, we afford "less deference to the trial court . . . to the extent that material facts definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility," *Hughes v. State*, 296 Ga. 744, 746 (1) n.5 (770 SE2d 636) (2015). Based on the peculiar facts of this case, it makes no difference whether we afford deference to the trial court's findings about the video recording or review the matter de novo. The trial court's finding that the recording of the post-invocation

exchange is "unintelligible" is not only accurate, but undeniably so. See Maj. Op. at 639 n.3. (acknowledging that "it is unclear what Burton said at this point in the interview").

Aside from Detective Ross's testimony and the video recording, there was no record evidence that could clarify what occurred during the post-invocation exchange. Because the court did not clearly err in disregarding Detective Ross's testimony on the matter or err (clearly or otherwise) in finding the recording of the exchange "unintelligible," the only permissible legal conclusion was that the State failed to carry its burden by a preponderance of the evidence to show that officers scrupulously honored Burton's invocation or that Burton reinitiated contact after invoking his right to remain silent. Accordingly, Burton's custodial statement was inadmissible.

Because Burton's statement was inadmissible, I see no reason to analyze, as the majority opinion does, whether the statement was voluntary. I therefore concur only in the judgment of the Court.

LaGrua, Justice, dissenting.

I respectfully dissent in this case because, even affording the trial court a high level of deference, the evidence does not support the trial court's determination that Burton's invocation was unequivocal and unambiguous, see *Walker v. State*, 312 Ga. 332, 336 (2) (b) (862 SE2d 542) (2021). However, I need not go into a step-by-step analysis of the *Riley* factors, see *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976), because I believe *Riley* is inconsistent with United States Supreme Court precedent as applied in this case, see *Fare v. Michael C.*, 442 U.S. 707, 724-725 (III) (99 SCt 2560, 61 LE2d 197) (1979) (concluding that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved" and discerning "no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so"), and we should reexamine *Riley* in the appropriate case.

Decided September 20, 2022.

Murder. Chatham Superior Court. Before Judge Karpf.

*Shalena Cook Jones, District Attorney, Timothy P. Dean, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Martin G. Hilliard*, for appellee.